Mary P. VALENTINO, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, Defendant.

Civ. A. No. 77–0331.

United States District Court, District of Columbia.

Jan. 16, 1981.

Stephen N. Shulman, Patricia Magee Vaughan and Susan A. Elliott, Washington, D.C., for plaintiff.

William H. Briggs, Jr., Asst. U. S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This class action was tried before the Court, sitting without a jury, during the first two weeks of December 1979. At trial the Court heard the testimony of twenty-nine witnesses, received into evidence numerous exhibits, and accepted the stipulations of the parties' counsel as to certain facts. After trial, at the Court's request, the parties' counsel submitted proposed findings of fact and conclusions of law. Upon consideration of the foregoing and the entire record, the Court makes the findings of fact and conclusions of law that follow.

## FINDINGS OF FACT

1. This is a class action brought by plaintiff Mary P. Valentino against defendant the United States Postal Service ("USPS") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

2. Plaintiff has exhausted her administrative remedies and has met the jurisdictional requirements set forth in 42 U.S.C. § 2000e–16(c) for bringing this action.

3. By order dated June 13, 1978, the Court certified the class which plaintiff represents as follows:

all females who since June 16, 1976, have been employed or are now employed by the United States Postal Service (USPS) Headquarters in the Washington, D.C. statistical metropolitan area in the positions compensated according to USPS pay scales at level PES–17 or higher, and who have been accorded disparate treatment because they have been denied advancement on the basis of their sex, excluding, however, any such females who are union members or who participated in the personnel decisions resulting in plaintiff Mary P. Valentino's individual claims.

4. In 1976 when the events concerning plaintiff's individual claims occurred, and in 1978, when the class she represents was certified, the USPS pay scale relevant to this action was known as the Postal Executive Schedule, or PES pay scale. Subsequent to the class certification, the PES pay scale has been changed.

5. As the first step in this change, the PES pay scale became the Executive Administrative Schedule, or EAS pay scale. The EAS pay scale is identical with the old PES scale in both pay scale and promotion procedures. Thus, for example an EAS–20 is what was formerly referred to as PES–20.

6. More recently, on March 31, 1979, the upper management levels of the USPS were placed under the Postal Carrier Executive Service, or PCES system. There are two levels in the PCES system: PCES–II and PCES–I. PCES–II's serve at the pleasure of the Postmaster General and are the officers of the USPS, the highest level in USPS management. PCES–I's are general managers and above, the second highest level in USPS management. Thus, PCES relates to the title of a position, not specifically to the position's former grade. As a general rule, all level 30 and above grades are now in the PCES system. There are, however, positions formerly below the 30 level included in the PCES system.

I. *Plaintiff's Individual Claim.*

A. *Background.*

7. In October 1970, Ms. Valentino left her position as Director of Personnel at the Equal Employment Opportunity Commission ("EEOC") to work for the then Post Office Department as an Employment Specialist (Women). The EEOC had recently reduced her pay grade, and by coming to the Post Office Department plaintiff increased her annual salary by approximately $2,000.

8. During this period, the functions of the Post Office Department were being transferred to the USPS. In implementing this transfer of functions, the Department offered certain employees an option to retire early with a six-month pay bonus. Ms. Valentino was within the group entitled to that option. In May 1971, just seven months after coming to the Department, she retired and received a six-month pay bonus of approximately $13,600.

9. Nine months later, in February 1972, Ms. Valentino reentered the work force as a Personnel Staffing Specialist at the Food and Drug Administration ("FDA"). In December 1972 she left that position and became Director of Personnel for the Consumer Product Safety Commission ("CPSC"). In February 1974 she left the CPSC and returned to the USPS as the Director, Office of Career Planning, PES–28. Unlike most, if not all, other persons who returned to the USPS after receiving the six-month retirement bonus, plaintiff was not required to repay the bonus upon her return.

B. *The Realignment.*

10. Plaintiff, as Director of the Office of Career Planning, was in the Employee and Labor Relations Group.[1] She, along with heads of seven other departments or offices, reported directly to the Senior Assistant Postmaster General for the Employee and Labor Relations ("E&LR") Group. Her staff consisted of herself and two other persons. On paper, her office had two responsibilities: the design, implementation, and monitoring of a Women's Program, and career planning for postal employees. There was a certain amount of overlapping between the career planning functions of plaintiff's office and those of other organizations within the E&LR Group. The problem of functional overlap was not, however, limited to the Office of Career Planning. James V. P. Conway, who became Senior Assistant Postmaster General ("SAPMG")

of the Group in September 1975, testified and the Court finds that at the time when he assumed that position the Group needed realignment, and that a large number of positions would in the interests of efficient management have to be eliminated.

11. Planning for the realignment began shortly after Mr. Conway became the SAPMG for the E&LR Group. All the Group's offices and high-level managers—including the Office of Career Planning and Ms. Valentino—contributed to planning the realignment. The goal of the realignment was to streamline and make more efficient the organization and to eliminate functional duplication among the numerous offices in the Group. During this planning phase, a conscientious effort was made to avoid considering what specific people would fill what specific positions in the new organization.

12. In April 1976 the realignment was announced, effective June 4, 1976. The realigned Group had approximately 100 fewer positions. Ms. Valentino's position as Director, Office of Career Planning, was one of the positions that had been eliminated.

13. Several new positions, including the directorships of the Office of Human Resources and the Office of Employee Services, were created by the realignment. Both of these new positions reported to Assistant Postmaster General ("APMG") Paul Carlin, who, as head of the Employee Relations Department, in turn reported to Mr. Conway, SAPMG for the E&LR Group.

14. A substantial number of people were affected by the realignment. Approximately 140 people became excess as a result of the realignment. These were people like Ms. Valentino, whose positions had been eliminated and who did not assume newly-created positions in the E&LR Group.

15. Ms. Valentino contended that the realignment should have been handled as a

---

1. At all times pertinent to this lawsuit, USPS Headquarters has been primarily divided into Groups. Each Group is headed by a Senior Assistant Postmaster General who reports either to the Postmaster General or the Deputy Postmaster General. 39 C.F.R. § 221.5(a). Groups are divided into departments headed by Assistant Postmasters General, or offices headed by directors. 39 C.F.R. § 221.5(b).

reduction in force ("RIF"), in which persons entitled to Veterans Preference are favored.[2] As the widow of a veteran, Ms. Valentino was entitled to preference under that Act.

16. Mr. Conway testified that the USPS sought to avoid using RIF procedures. Among the reasons for avoiding RIF procedures, particularly relevant in the context of this litigation, was that the favoring of veterans would have serious adverse effects on female employees, most of whom were not entitled to Veterans' Preference.

17. Ms. Valentino filed an administrative charge with the Civil Service Commission challenging the realignment. She contended that the realignment was improper because the USPS had failed to follow the Veterans' Preference Act. She was unsuccessful in persuading the Commission of the merits of her claim. However, she pursued this contention long after she took up the advocacy of women's rights.

18. Somewhat inconsistent with plaintiff's advocacy of women's rights is her continued insistence upon her veterans' preference bumping rights which are a part of the RIF procedures which she advocates in lieu of the realignment program. RIF procedures disproportionately favor male employees who are more likely to have veterans' preference than women. Second, plaintiff's advocacy of RIF procedures which might help her but not women generally impairs the efficacy of her representative position. Her notion of what is discriminatory or not discriminatory appears to turn on whether the policy benefits her personally rather than women generally.

C. *The Essential Vacancy System.*

19. On November 12, 1975, the Postmaster General directed that all vacancies at Headquarters be filled from within. This directive was viewed as a fundamental change in policy. It brought outside hiring at the USPS to a virtual standstill and committed the USPS to a policy of filling high-level management jobs from within.

20. On January 28, 1976, the USPS established its Essential Vacancy System to implement the Postmaster General's policy of promoting from within. The system prohibited the filling of vacant positions which were not considered essential. With regard to those positions which were to be filled, the Essential Vacancy System brought two fundamental changes into promotion practices at the 17 and above levels at USPS Headquarters. First, it required the advertising, or posting, of all vacancies at levels 29 and below to be filled by promotions. Initially, the posting of vacancies at levels 30 and above was optional. Later, it became mandatory to post all vacancies except officer positions. The purpose of this posting requirement was to get a broader range of candidates for positions. Second, the Essential Vacancy System established the use of Review Committees to screen applicants for promotion. These Review Committees were to include, if possible, either a female or a member of a minority. The Essential Vacancy System is still in force, except that since March 1979 positions at the General Manager and above levels have been filled under the entirely new procedures of the PCES system.

D. *Plaintiff's Promotion Efforts.*

21. On April 15, 1976, announcements were posted under the Essential Vacancy System for the new positions of Director, Office of Employee Services ("OES"), PES–29, and Director, Office of Human Resources ("OHR"), PES–30. They were the 30th and 32nd vacancies, respectively, to be announced under the new system. A single Review Committee was selected to fill both

**2.** The USPS is subject to the requirement of the Veterans Preference Act, which requires that certain veterans, spouses of veterans, and parents of veterans be given preferential treatment in specified employment situations, including a RIF. 39 U.S.C. § 1005(a)(2). Plaintiff was one of three selectees for the position of Director of

the Office of Employee Services. Ultimately, Mr. Weems was selected for this position. It is significant that he also had veterans' preference rights. See Finding 36. In this instance, veterans' preference rights would not have helped her.

positions. It consisted of one woman, Nancy George, and four men, Joseph Jackson, Emmett Cooper, Peter DelGrosso, and John Wise. Mr. Cooper was a member of a minority group.

22. The Committee was appointed by Mr. Conway. He personally selected the individual panel members and considered each to be "eminently qualified" to serve on the Committee. All were high-level managers with extensive experience in all phases of USPS operations, including managing large USPS installations and functions and working with a wide variety of USPS personnel matters.

23. Plaintiff submitted an identical application for both positions. There were 53 applicants for the OES position and 66 applicants for the OHR position. The Review Committee determined that it would interview six applicants for each position. Each Committee member reviewed the applications which had been submitted. The Committee then met, reviewed the applications jointly, and reached a consensus as to whom to interview for each position. The Committee decided to interview Ms. Valentino for the OES position, but not for the OHR position.

24. Included with each application was an "Estimate of Potential" prepared by the applicant's supervisor. Ms. Valentino's Estimate of Potential was prepared by Mr. Conway. In his comments regarding Ms. Valentino, Mr. Conway referred to her as "an attractive manager who conceptualizes well." Plaintiff's Exhibit 83. Mr. Conway testified that he included this phrase to mean that Ms. Valentino was an attractive candidate, in the sense that her application merited serious attention. In response to questioning by plaintiff's counsel he denied that he was referring to Ms. Valentino's physical appearance, and further stated that he has characterized candidates of both sexes as "attractive." The Court credits Mr. Conway's testimony. Neither of the two panel members who testified about Mr. Conway's evaluation understood the adjective "attractive" to be directed at Ms. Valentino's looks. Neither testified that Ms.

Valentino's physical appearance was a consideration by the panel.

25. Ms. Valentino also testified that Mr. Conway never discussed her Estimate of Potential with her. She apparently feels that without such a discussion he should not have completed the block on the estimate calling for "the highest positions or types of responsibilities he or she aspires to achieve." Plaintiff's Exhibit 83. Mr. Conway testified that he had a large number of estimates to fill out at that time; that he was already late in completing them; that he did not think the information called for by that block was critical to her application; and that he therefore completed the block as follows: "for the present, Office Director, PES–29/30." Review Committee member Nancy George testified that if the Estimate of Potential had reflected that Ms. Valentino wanted a higher position than the one indicated, that fact would have made no difference to the Review Committee's decision. The Court credits Ms. George's testimony. The Court thus finds that plaintiff's complaint about this item is of no real significance. Moreover, the Court believes that her concern is not probative of sex discrimination. There is no evidence that Mr. Conway interviewed men whose Estimates of Potential he was preparing. Furthermore, Mr. Conway's unrebutted testimony was that he gave Ms. Valentino a better estimate than some of the male employees he evaluated for the position in question.

26. Following the interviews, the Review Committee reached a consensus on the three persons to recommend for each position and forwarded their names to Mr. Carlin, the selecting official. Plaintiff was not recommended to Mr. Carlin for either position.

27. The Essential Vacancy System was implemented under Mr. Carlin's direction. It was his responsibility as APMG for the Employee Relations Department. This was his first personal involvement with the new system. Because of these circumstances, he experimented with "quantifying" the Review Committee's selection process by

means of an experimental point system. In so doing, he examined the Review Committee's appraisals of all candidates interviewed including Ms. Valentino. Different point systems yielded different results and Mr. Carlin eventually abandoned his attempt to quantify the Review Committee's selection system. For purposes of making the promotion—as opposed to trying to quantify the practice—Mr. Carlin considered only the persons recommended by the panel. Thus, Ms. Valentino was not considered for either position. After a brief consultation with Mr. Conway, who approved his selections, Mr. Carlin selected Mr. Brian Gillespie for the Director, OHR position, and Mr. Elmer Weems for the Director, OES job.

28. There is no evidence suggesting that the panel considered Ms. Valentino's sex in deciding not to recommend her, nor is there anything in the record to indicate that Mr. Carlin considered her sex in deciding not to select her despite the panel's failure to recommend her. Ms. George testified that the panel compared applicants on the basis of respective strengths and weaknesses. This testimony was not challenged. Nor was the testimony of Mr. Carlin challenged that he would not have treated Ms. Valentino differently had she been a man. Indeed, like Ms. Valentino, several men had been denied an interview for the OHR position.

29. Ms. Valentino bases her individual claim on the contention that her rejection must be suspect because her qualifications were so markedly superior to those of the candidates who were selected. She testified about her years of experience with federal personnel systems, and her success in establishing the personnel system of two new, small agencies. She further testified that she had experience with each of the duties for the two positions being sought. She made no claim, however, that she had acquired her experience at the USPS. Those duties were listed on the job announcements introduced as Plaintiff's Exhibits 81 and 82 and are set forth in the margin.[3] Ms. Valentino also noted that the Committee was told to look for people with managerial ability and technical knowledge and she testified that her background entitled her to the highest rating in those areas.

30. Three witnesses offered testimony in support of Ms. Valentino's claim that she was highly qualified for the positions: Randall Batson, her friend, former subordinate at the USPS, and former co-worker at both the FDA and CPSC; Jeffrey Sindler, a former co-worker; and Henry Gronkiewicz, also a former co-worker. None of these three had any connection with the filling of the vacancies in question; none had the breadth of USPS experience of any of the panel members or the selecting official; and none had reviewed any of the applicants submitted to the Committee.[4]

3. The duties for the Director, OES, were listed as:

> Directs the development, implementation and monitoring of the *Postal Service* medical and health programs, occupational safety and health and accident programs, environmental improvement, suggestions and incentive awards and other personnel practices programs; directs the administration of the total headquarters personnel services function, and the development and administration of policies and procedures related to the injury compensation program; provides policy interpretation and program guidance to the regional employee services units through the Assistant Postmaster General, Employee Relations. (Emphasis added.)

The duties for the Director, OHR, were listed as:

> Directs, plans, develops, recommends and implements programs, policies and procedures affecting *Postal Service* employees in the areas of recruitment, testing, selection, qualification standards, placement, nonexecutive career development, upward mobility for women, Employee and Labor Relations Information systems, personnel action processing (including the Personnel Service Centers, non-bargaining discipline procedures, and Civil Service Commission appeals involving bargaining unit employees). (Emphasis added.)

4. Gronkiewicz, however, had also been a candidate for the OES position. He stated that he was better qualified for the position than Ms. Valentino because, in his view, she lacked experience in labor relations. Gronkiewicz, a male, was not among those interviewed for the position. *Gronkiewicz*, Tr. I at 112, 120. Thus, his opinion of his own qualifications also differs from the Review Committee's since they did interview Ms. Valentino for this job.

31. In evaluating her experience, Ms. Valentino fails to note that both the job announcements specifically state that the incumbent will have to work with various programs involving *Postal Service* employees. The Court takes judicial notice of the fact that the standard Civil Service rules and regulations with which Ms. Valentino had spent her professional career had not worked well for the old Post Office Department, and that one of the purposes specified by Congress in enacting the Postal Reform Act was to free the Postal Service from that system and subject it to private sector collective bargaining concepts. 1970 *U.S. Code Cong. & Admin.News* 3649, 3662. To that end, Congress freed the USPS from most "federal law[s] dealing with employees ....", 39 U.S.C. § 410(a); generally authorized the USPS to establish its own personnel system, 39 U.S.C. § 1001(a); and made significant portions of the National Labor Relations Act applicable to the USPS. 39 U.S.C. § 1209. In short, Ms. Valentino's experience was with a personnel system which had not been applied in the USPS for six years, and which the Congress had found to be inadequate to meet the needs of the Postal Service.

32. This lack of relevant experience goes to the heart of Ms. Valentino's claim of technical expertise. In April 1976, Ms. Valentino had only about two years of experience with the USPS and approximately one-fourth of that time was before the transition from Post Office Department to USPS was complete. She had no experience with labor-management relations under the National Labor Relations Act. Her only experience with unions was in the federal sector, the labor-management relations of which differ significantly from those in the USPS. Despite this lack of experience in USPS labor relations, Ms. Valentino applied for two positions in which she would have administered nationwide programs that had a substantial impact on labor relations in the USPS. Indeed, approximately ninety percent of the USPS work force of about 650,000 is subject to collective bargaining agreements.

33. Ms. Valentino's lack of technical knowledge was not limited to the obligations of the USPS under the National Labor Relations Act. Her applications indicate that she had no field experience. Many of the programs to be administered by the two new directors, such as testing and training, and the injury compensation program, required an intimate knowledge of the workroom floor. Mr. Conway testified that he would have felt "uncomfortable" with an individual in the OHR position who lacked the "long learning process" Ms. Valentino would have needed to become familiar with such matters. Moreover, for the same reason the announcement for the OES position did not specify a general, federal personnel background like Ms. Valentino's as a desirable qualification, but did specify that applicants should have "[e]xtensive experience in ... *postal field operations* ...." Plaintiff's Exhibit 81 (emphasis added). The evidence in this case which is not challenged is that field experience is an extremely important and necessary qualification for the high-level USPS management positions such as those for which Ms. Valentino applied.

34. Plaintiff's claim to managerial experience is not persuasive. The two new director positions were not first line supervisors, but managers of programs administered nationwide in 44,000 postal installations. The incumbents had to manage subordinate managers who were themselves responsible for functional areas. Nothing in the record before the Review Committee suggests that Ms. Valentino had such experience. Ms. Valentino contended that her management abilities had been proven in administering the personnel offices of the EEOC and the CPSC. Both agencies had total complements of about 1,000 people. In each, her staff was far smaller than those of the positions for which she was applying.

35. The Court finds that Mr. Gillespie was better qualified for the OHR position than Ms. Valentino. In the USPS, he acquired extensive experience in various functional areas of the USPS. He had experience as an Executive Management Trainee,

Employee-Management Cooperation Specialist, Labor Relations Specialist, Manager of Labor Relations, and Director of the Office of Programs and Policies. He had acquired valuable field experience while working in the New York region and while managing a post office in California. He also had acquired management experience and an extensive knowledge of USPS labor relations and other USPS programs to be administered by the Director of the Office of Human Resources. Ms. Valentino, on the other hand, did not have comparable experience in the various functional areas of the USPS. Her career experience was generally limited to the field of federal personnel systems, experience which was of limited utility at the USPS where the federal personnel system was not used. She lacked field experience. She also lacked experience in USPS labor relations and with other programs to be administered by the Director of the OHR. She did, however, have experience with the program for upward mobility for women. On balance, Mr. Gillespie was the better qualified candidate.

36. The Court finds that Mr. Weems was better qualified for the OES position than Ms. Valentino. Shortly before coming to the USPS in 1970, Mr. Weems had retired from the United States Army as Lieutenant Colonel. While with the Army, he acquired a wide variety of valuable experience, among other things in supervising civilian personnel. While with the USPS, he acquired extensive experience in various USPS functional areas. He had held positions as a Management Institute Specialist, Mobile T.E.A.M. (Team Effectiveness Approach to Management Program) Chief, Training and Development Institute Field Center Manager, Manager of the Adminis-

trative Services Division of the Training and Development Institute, and General Manager of the Planning and Placement Division. He had acquired extensive field experience in these positions, and was known as a good manager in large organizations. In contrast, Ms. Valentino did not have as much experience with the USPS and its programs as did Mr. Weems. Ms. Valentino lacked field experience. While she had an edge over him with regard to the personnel services function of the OES position, his experience in management and in the field better qualified him for supervising the many other programs to be administered by the Director, OES.[5] On balance, then, Mr. Weems was a better choice for the OES position than Ms. Valentino.

### E. *Reassignment of Valentino.*

37. Following realignment of the E&LR Group, some 140 people were in "excess" positions. Mr. Conway encouraged excess employees to seek out aggressively vacancies for which they wished to be considered and encouraged managers to nominate and recommend such employees for consideration for filling any vacancies in their organizations.

38. Eugene C. Hagburg, then Director of the USPS Training and Development Institute (PST & DI), testified that he learned that Ms. Valentino was an excess employee at a time when he needed to fill a level 28 position, the General Manager, Operating Services Division. Under USPS procedures, Mr. Hagburg had the option of laterally reassigning someone at a level 28 into the position or of posting the vacancy under the new Essential Vacancy System. Choosing the former course, Mr. Hagburg decided to see if Ms. Valentino was interested in the position. By laterally reassigning

---

**5.** After the OES and OHR positions were filled, the USPS transferred the responsibility for the program for the upward mobility for women from the OHR position to the OES position. Plaintiff argues that if the OES had been given responsibility for this program when the selections for the two positions were being made, she would have been better qualified for the OES position than Mr. Weems. This argument has facial appeal. While plaintiff would have had an edge over Mr. Weems with respect to administering this program, that edge would have been insufficient to make her the better qualified applicant. As indicated above, Mr. Weems' managerial and field experience better qualified him for the OES position, and this would have been the case regardless of whether the women's program was included in the OES position or not. This was the position the selecting official took and the Court agrees.

her, Mr. Hagburg saw an opportunity to fill the position quickly and to fill it with a woman. He preferred a female candidate, in part, because he recognized that his performance in the EEO area would be reviewed by his supervisors. Indeed, Ms. Valentino was one of the two women Mr. Hagburg sought out for reassignment to jobs under his supervision.

39. On June 2, 1976, Mr. Hagburg telephoned Ms. Valentino to determine whether she would be interested in the position. He thought her response to his telephone inquiry was "positive." A meeting between the two took place a few days later at which time the position was discussed. Mr. Hagburg continued to believe Ms. Valentino was interested in the position. He understood she wanted more time to consider her options. Mr. Conway told Ms. Valentino that Hagburg's position was the best he had available at the time. In Mr. Conway's opinion, the position was a good opportunity for Ms. Valentino, and he approved her reassignment. Both Mr. Conway and Mr. Hagburg thought that Ms. Valentino voluntarily accepted the new position.

40. The position to which Ms. Valentino was reassigned in August 1976 was a position of considerable importance. In most respects it was superior to Ms. Valentino's former position. It entailed broader responsibility: as General Manager, Operating Services Division, the incumbent was responsible for one of the largest correspondence courses in the country. Some 70 people reported to this General Manager, through at first five, and later four, subordinate managers. This contrasts with the two subordinates Ms. Valentino had as Director, Office of Career Planning. As Mr. Carlin testified, the position would have provided Ms. Valentino with a kind of management experience she had not had up to that point.

41. Ms. Valentino now argues that the Operating Services position was a "downgrade" from Career Planning, because she reported to the SAPG through intermediate supervisors, rather than directly. Mr. Carlin, however, testified that rank is not dependent solely on reporting relationship. The Court credits Mr. Carlin's testimony. Moreover, the Civil Service Commission rejected Ms. Valentino's "reduction-in-rank" allegation when that claim was presented in the context of her Veterans' Preference Appeal.

42. Ms. Valentino also testified that she was placed in a building separate from the building in which her supervisor, Mr. Hagburg, was housed. She also complained that two of her subordinates were housed in Mr. Hagburg's office building and reported directly to him. The Court finds these complaints without merit. As Mr. Hagburg explained, none of Ms. Valentino's subordinate managers reported directly to him. Furthermore, there was nothing unusual about the physical location of Ms. Valentino or her subordinate managers. Of the half dozen or so buildings at the Institute there were two primary office buildings, a block apart. Ms. Valentino was housed in one, along with two of her subordinate managers; Mr. Hagburg was housed in the other, along with two more of Ms. Valentino's subordinate managers. Ms. Valentino's fifth subordinate manager was located in Norman, Oklahoma. Ms. Valentino never complained to Mr. Hagburg about her physical location and her reporting relations with her staff. Indeed, she had regular staff meetings with her subordinate managers and had full authority to manage all five of them.

43. Ms. Valentino subsequently sought and received employment outside the USPS. She left the USPS in October 1978 for a position with another federal agency, the Community Services Administration where her salary at the time of the trial was $47,600. Her salary at the United States Postal Service was $35,500.

## II. Plaintiff's Class Claim.

44. Plaintiff's class allegations, as originally framed in the complaint, alleged that she would represent every past, present, and future female employee of the USPS work force and every past and future female applicant for employment by the

USPS who had been and was being discriminated against on the basis of sex. Those "boiler plate" allegations were apparently intended to provide plaintiff with a basis for engaging in discovery rather than to provide the USPS with notice of what class claims she intended to litigate. The Court thus finds that plaintiff's complaint did not provide the USPS "with the essential information necessary to determine [either] the subject matter [or] size of the prospective litigation . . . ."[6]

45. The second class definition proposed by plaintiff was also too broad to provide the USPS with the notice to which it was entitled. The Court therefore finds that the defendant did not have that notice until this Court defined a class for plaintiff in its June 13, 1978 certification order.[7]

46. Plaintiff seeks to prove her allegation of sex discrimination against the certified class in two fashions: (1) by individual, anecdotal testimony regarding various past events, and (2) by statistics.

### A. *The Non-statistical Evidence.*

### 1. *The Claim of Class Member Samuels.*

47. Plaintiff presented the claim of Gladys Samuels, a class member, who was denied a promotion to a vacancy in the Northeastern Region. As a threshold matter, the Court notes that Ms. Samuels' claim is of no probative value in determining whether a practice or policy of sex discrimination exists at USPS Headquarters in the Washington, D.C. area. Had she obtained the position, she would have worked in New York City and would have lost her status as a Headquarters employee. The selecting official was a Regional official, not a Headquarters official. The Promotion Panel which declined to recommend her for promotion was made up of persons who work in Chicago, New York, and New Jersey.[8]

48. Ms. Samuels' claim that her failure to obtain the New York promotion was sex discrimination is open to question. Ms. Samuels charges that the Committee rejected her because she was both female and black. Yet two out of three members of the panel were black. Moreover, at the time she filed this EEO complaint, she had a second complaint pending in the USPS Southern Region in Memphis, Tennessee. In that complaint, Ms. Samuels charged that a promotion had been denied her because of her race and sex, even though the person promoted was also a black female. Apparently, Ms. Samuels considers all personnel actions which are adverse to her to be discriminatory, and her testimony that any particular one was discriminatory must be discounted accordingly.

49. Ms. Samuels also testified that after she filed her EEO charge, she received a letter from the panel member which criticized her for acting like a "woman scorned." The author also sent a similar letter to a black male who had filed a complaint over the same personnel action which is the subject of Ms. Samuels' complaint. The attitude of the Postal Service, as opposed to the author of the letter, is clear. The author was disciplined.[9] He has since retired from the USPS.

50. Ms. Samuels' only testimony probative of general USPS Headquarters policy favors defendant rather than plaintiff. Ms. Samuels came into the USPS in a clerical position and now occupies a professional position. It appears that more rapid ad-

**6.** *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 555, 94 S.Ct. 756, 767, 38 L.Ed.2d 713 (1974), quoted in *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 392–93, 97 S.Ct. 2464, 2468–2469, 53 L.Ed.2d 423 (1977).

**7.** Order ¶ 3.

**8.** At trial Ms. Valentino suggested that because a question on Review Committee procedure was referred to Mr. Carlin in Washington, there was a nexus between Headquarters and New York City regarding Ms. Samuels' nonselection.

The Court finds that there was no nexus. Carlin had nothing to do with the rejection of Samuels' application.

**9.** In the trial transcript, Conway is shown as having characterized the letter as a "pretty darn *good* memorandum." Conway, Tr. III, 109. As the February 7, 1980 affidavit filed by Mr. Conway states, the transcript is erroneous; he referred to the letter in question as being "a pretty darn *dumb* letter."

vancement by Ms. Samuels has not been impeded by her sex.

### 2. The Claims of Class Members Anderson and Broadhurst.

51. Jo Elaine Anderson and Helen Broadhurst are black, female class members who competed against each other for the position of Marketing Specialist at Headquarters. Both were among the five persons recommended by the Review Committee as best qualified. The selecting official, William A. Rissell, a General Manager at USPS Headquarters, selected a white male applicant who had also been certified by the Committee. Both Ms. Broadhurst and Ms. Anderson have claimed that this selection is sex discrimination, although both have elsewhere suggested that it may instead be race discrimination.

52. There is nothing in either woman's testimony to suggest that Mr. Rissell's decisions were influenced by an overall practice or policy of the USPS. Indeed, it is most unlikely that Mr. Rissell's alleged policy of discrimination could have been even department-wide, inasmuch as two of the other General Managers within the department are women.

53. Moreover, there is no evidence from which this Court could infer a discriminatory animus on the part of Mr. Rissell. Ms. Anderson and Ms. Broadhurst both rest their claims on the superiority of their qualifications over those of the male applicant selected.[10] There is, however, nothing in the record which allows the Court to compare those qualifications. Instead, the Court must choose between the class members' conclusory and contradictory assertions that each was the best qualified for the position in question, and Mr. Rissell's testimony that he interviewed each candidate, reviewed the qualifications of each, and made his selection based on the relative qualifications and experience of each of the applicants, as well as the performance of each on a written exercise. The Court credits Mr. Rissell's testimony and thus declines to infer from the record before it that Mr. Rissell selected the male candidate on the basis of gender.

54. Plaintiff sought to establish Mr. Rissell's anti-female animus by showing that he gave a "test" to the five applicants; that he sent Ms. Anderson a confidential memorandum expressing displeasure with her repeated absences; that he asked Ms. Anderson to type; that he denied an EEO counsellor access to the promotion file; and that he removed certain papers from the promotion file. None of these actions is probative of a sex animus on Mr. Rissell's part. Moreover, Mr. Rissell had a legitimate reason for each challenged action.

55. The "test" Mr. Rissell had each applicant take was an exercise in which the applicant was required to correct a draft document similar to those which the person promoted to the position would be responsible for preparing. Moreover, this exercise was apparently not biased against women, inasmuch as Ms. Anderson made the best grade of all the applicants on the test. The confidential memorandum was sent to Ms. Anderson because she was abusing her leave privilege and was caught falsifying her time records. Mr. Rissell expected all his employees to type when clerical shortages required them to do so. Because the EEO counsellor was not an official investigator, Mr. Rissell delayed providing her with information concerning people other than the complainants until he could obtain advice concerning his obligations under the Privacy Act.[11] Finally, Mr. Rissell was asked to send the promotion file to the Headquarters personnel office for reasons

---

10. Ms. Anderson also rests her claim on the fact that of the six professionals in her division, she is the lowest and the only female. During cross-examination she conceded that a year earlier one of the highest of the professionals in her division was a female.

11. 5 U.S.C. § 552a. An EEO counsellor is charged with conciliating an informal complaint of discrimination. 29 C.F.R. § 1613.213. An EEO investigator is charged with "a thorough review of the circumstances under which the alleged act of discrimination occurred" after a formal complaint is filed. 29 C.F.R. § 1613.216.

unknown to him.[12] The papers he removed were personal notes, which are not considered part of the promotion file. Moreover, the removed papers have not been destroyed, and are still maintained in his office. Plaintiff made no attempt to show that any of Mr. Rissell's explanations were pretextual.

56. The only testimony presented by either Ms. Anderson or Ms. Broadhurst which is probative of the general attitude at USPS Headquarters toward women is the statement of each woman that she entered the USPS as either a clerical or blue collar worker and now holds a professional position.

### 3. The Claim of Class Member Oliver.

57. Mildred Oliver testified that prior to 1974 she had been promoted by Mr. Troy and Mr. Sharp to the position she now holds, and until that time she received good merit evaluations from Mr. Troy. She alleges that in 1974 Mr. Troy became aware that there would be a vacancy in a higher position, and that he "set her up" by suddenly lowering his evaluations of her because of sex so that he and Mr. Sharp could select a man for the position. She further contends that Mr. Troy's poor evaluations of her continued due solely to sex and that, as a result of those evaluations, she was denied a 1976 promotion which went to a male. Even if entirely true, Ms. Oliver's testimony does not support an inference of a policy of sex discrimination by the USPS. Her complaint is rather that Mr. Troy and Mr. Sharp, acting as individuals, have discriminated against her because she is a woman.

58. Moreover, her claim is not persuasive. Between the time Ms. Oliver was given her last good evaluation and the time she began receiving poor evaluations, she was promoted. Mr. Troy's lowered evaluations of Ms. Oliver are far more likely to be the result of poorer performance in her new job than sex animus. Both Mr. Troy and Mr. Sharp promoted Ms. Oliver to her cur-

rent position. Additionally, Mr. Sharp brought a woman into a second professional position. Either Mr. Sharp or Mr. Troy was responsible for that woman being promoted a second time. Thus, there is no evidence that either Mr. Troy or Mr. Sharp was motivated by a general bias against women.

59. Mr. Troy did not reject Ms. Oliver's application for the 1976 position. Indeed, she was not recommended to him by the Review Committee. Ms. Ann Robinson, the chairman of that Committee and a class member, testified that Ms. Oliver was rated low by the Committee in large part because of her unimpressive interview and unimaginative approach to problem solving.

60. While employed by the USPS, Ms. Oliver had advanced from a clerical job to her current professional position.

### 4. The Claim of Class Member Bach.

61. Patricia Hamil Bach testified that she was denied a promotion because of gender. She had been interviewed by a Review Panel which did not recommend her. Nothing in her claim suggests that the Review Committee's decision was made in conformity with any pattern or practice at USPS Headquarters.

62. Ms. Bach rests her claim of discrimination on the theory that she was the best qualified candidate and that her nonselection could be explained only by sex discrimination. However, no evidence was introduced which would allow the Court to compare her qualifications to those of the other candidates.

63. Julie McCarthy, a class member, chaired the Review Committee that interviewed Ms. Bach for the position which is the subject of her complaint. As Ms. McCarthy testified, the panel felt Ms. Bach's technical and educational qualifications minimally qualified her for the position in question. For that reason the panel decided to interview Ms. Bach. The panel felt that Ms. Bach's interview was not as impressive as the interviews with the

---

12. In fact the reasons were that plaintiff had requested certain information from all Essential Vacancy files.

twelve other candidates minimally qualified for the position. Specifically, the panel was disappointed with Ms. Bach's ideas regarding solving some very serious problems in the branch to be managed as well as her approach to managing the functions of the position. Ms. McCarthy testified that she and the other panel members ranked Ms. Bach slightly below the middle of the 13 applicants whom they interviewed for the position. Three names were forwarded to the selecting official. Ms. Bach was not close to those certified as the best qualified candidates. There is no credible evidence upon which the Court could conclude that Ms. McCarthy and her fellow panel members would have selected Ms. Bach if she were a man. Indeed, Ms. McCarthy's testimony, which the Court credits, is to the contrary.

### 5. The Testimony Concerning Biglin.

64. Ms. Valentino introduced evidence concerning the efforts of Francis X. Biglin, the then SAPMG in charge of the Finance Group, to intervene in the efforts to promote two class members: Alexandra Moroney and Mary Pescatore. These instances both arose out of Mr. Biglin's practice of reviewing the promotions of all professionals within the Group.

65. In reviewing the promotion file for a Mail Classification Specialist, Mr. Biglin noted that the successful candidate, Ms. Moroney, seemed to lack qualifications that another male candidate had. Moreover, Ms. Moroney's mother worked on the Postmaster General's staff, and Mr. Biglin was concerned that charges of nepotism might be made in the event of Ms. Moroney's selection. Mr. Biglin therefore asked the selecting official why Ms. Moroney was chosen. The selecting official's reply was satisfactory to Mr. Biglin, and he approved Ms. Moroney's promotion.

66. Subsequently, Mr. Biglin reviewed the promotion of Ms. Pescatore to the position of Senior Statistician. Originally, the selecting official had determined that none of the candidates, including Ms. Pescatore, should be promoted to the position. Mr. Biglin denied permission to recruit from outside the USPS and ordered the selecting official to select one of the candidates. Ms. Pescatore was selected. It then came to Mr. Biglin's attention that Ms. Pescatore's promotion would involve a pay increase of over 30%. USPS regulations at the time limited employees to increases of 15% a year. Mr. Biglin explored several alternatives which would have allowed Ms. Pescatore to fill the position and keep her salary increase within the 15% limit. While he was doing this, he was told that Ms. Pescatore had already been informed that she would get the position and the more than 30% pay increase. Mr. Biglin then approved the promotion, thus favoring Ms. Pescatore over similarly situated male and female employees bound by the 15% rule.

67. It is difficult to see how Mr. Biglin's actions regarding Ms. Moroney and Ms. Pescatore amount to anything other than acceptable management practices. Certainly, neither Ms. Moroney nor Ms. Pescatore was adversely affected by virtue of sex. Indeed, neither testified in this case that they felt they were the victims of sex discrimination.

### 6. The Testimony of Julie McCarthy.

68. In rebuttal to Ms. Bach's claim of sex discrimination, defendant called another class member, Ms. Julie McCarthy. Besides testifying persuasively that Ms. Bach was not the victim of sex discrimination, Ms. McCarthy expressed her views regarding plaintiff's allegations of discrimination against a class of women in Headquarters, level 17 and above, Washington SMSA.

69. In the past year and a half Ms. McCarthy has been a member of approximately 20 different Review Committees for a variety of positions throughout the USPS, including Washington, D.C. Headquarters positions. As Ms. McCarthy testified, the sex of any female applicant was not considered by any of these panels in determining whether that applicant was qualified to hold the position being filled. Ms. McCarthy emphasized her conclusion that the panels of which she had been a member had not discriminated against women whose applications they had reviewed.

70. Ms. McCarthy is a PCES–I employee of the USPS. As a high level female USPS employee, Ms. McCarthy expressed her conviction that the USPS has not discriminated against women as a class in levels 17 and above at USPS Headquarters in Washington, D.C. To the contrary, she testified that the USPS was committed in principle and in actuality toward providing advancement opportunities for all its employees regardless of sex. She noted a number of programs which typified this commitment such as training programs, the Headquarters-Field Interchange Program, the Officer in Charge (OIC) Program, educational programs, and the policy of using temporary assignments to give employees training in areas where they have not previously worked.

71. Ms. McCarthy has personally benefitted from many of the programs which she identified. Ms. McCarthy is presently assigned to a Sectional Management Center in Clarksburg, West Virginia. This assignment allows her to gain experience in an area of USPS business outside of the bulk mail background in which she has previously worked. This assignment has given Ms. McCarthy important field experience which will help her advancement in the Postal Service. Furthermore, Ms. McCarthy has participated in the USPS' Executive Development Program. Under this program the Postal Service sent her to Cornell University for additional, high-level management training.

72. Finally, Ms. McCarthy stated that she had not been the victim of sex discrimination by the USPS during her eight years of service. To the contrary, she testified that she had had a wide variety of interesting and challenging jobs with expanding responsibilities. Her opportunities have been almost unlimited and being female has not been a negative factor in her experience.

7. *The Testimony of Ann Robinson.*

73. In rebuttal to Ms. Oliver's claim of sex discrimination, defendant called another class member, Ms. Ann Robinson. Besides testifying convincingly that Ms. Oliver was not the victim of sex discrimination with regard to her individual complaint, Ms. Robinson discussed plaintiff's claims of discrimination in USPS Headquarters, Washington SMSA, against women at levels 17 and above.

74. Ms. Robinson has served on approximately 10–12 Review Committees for positions advertised in the PES–17 and above levels at USPS Headquarters, Washington, D.C. SMSA. The sex of female applicants had never been the subject of discussions by the Review Committees for any of these positions. Moreover, Ms. Robinson has never observed sex discrimination against any female applicant by any of the panels on which she has served.

75. When asked for her personal observations as to whether the class in this case had been the victims of sex discrimination by the Postal Service, Ms. Robinson responded:

> I have no knowledge of such discrimination. Indeed I have seen the hiring and selection process from the standpoint of an applicant, from the standpoint of the member of the Review Committee, from the standpoint of the chair of the Review Committee and from the standpoint of the hiring official and I have not seen evidence of discrimination as you have outlined.

76. Moreover, as a PCES–I employee, Ms. Robinson is a member of the second highest group of management officials in the Postal Service. In this position she has been able to observe, firsthand, the commitment of upper management to upward mobility for women in the USPS. Ms. Robinson described that commitment as follows:

> The Postmaster General's public pronouncement[s] on this subject I think are quite clear. I have had the opportunity to speak with him personally on a one-on-one situation. I've had the opportunity to be part of a group of women managers that luncheoned with him and discussing the progress of women and I know quite clearly and believe quite strongly that his commitment to the identification and to the advancement of qualified women is

total and is a compelling commitment and I believe that his philosophy has filtered down to his top managers.

77. Additionally, Ms. Robinson testified about some of the programs which the USPS has developed to facilitate and accomplish upward mobility for women. Specifically, she identified the Essential Vacancy System, the Headquarters-Field Interchange program, and the Executive Leadership program.

78. Ms. Robinson has participated in various programs she identified. As noted, she has been extensively involved in all aspects of the Essential Vacancy System. Moreover, she benefitted from a two-month assignment as Acting Postmaster and Sectional Center Manager in Norfolk, Virginia, which she described as "invaluable" experience. Ms. Robinson spent six weeks at the University of Virginia in the Executive Leadership program.

79. Finally, Ms. Robinson has not experienced sex discrimination in her 13 years as a USPS employee. To the contrary, Ms. Robinson testified that in her opinion women have a distinct advantage in the USPS.

8. *The Testimony of Nancy George.*

80. In rebuttal to Ms. Valentino's individual claim that she was the victim of sex discrimination by the Review Committee that considered her applications for the positions of Director, DHR, and Director, DES, defendant called a member of the Review Committee, Nancy George.[13] Besides testifying convincingly that the Review Committee did not single Ms. Valentino out for adverse treatment because of her sex, Ms. George testified about her experience as a female employee in USPS Headquarters.

81. Ms. George has been a member of approximately 12 Review Committees under the Essential Vacancy System. Sex discrimination against female applicants has not been condoned by those Review Committees.

82. Ms. George is a PCES–II employee of the USPS. By virtue of her high level position in the USPS, including her present job as Assistant Postmaster General in charge of the Employee Relations Department, Ms. George has been able to observe, firsthand, the determination of top management to provide upward mobility for women. This was illustrated by a very firm commitment by top management to provide opportunities through a variety of programs and job experiences to enhance women's abilities to become competitive individuals for upward advancement.

83. Ms. George also testified specifically that Mr. Carlin and Mr. Conway, two of the individuals whom Ms. Valentino has characterized as discriminating officials, are both committed to the USPS policy of encouraging upward mobility for women. With regard to Mr. Carlin, Ms. George related a personal experience of being on panels where Mr. Carlin was also interviewing candidates. Ms. George observed that Mr. Carlin always questioned the candidates intently about their attitudes toward women and minorities before recommending anyone for a supervisory management position. George, Tr. II at 160. Similarly, Ms. George described Mr. Conway as a dedicated manager who was committed to all programs in the USPS including the Women's Program and upward mobility.

84. Ms. George also identified specific programs which she felt were examples of the commitment of the USPS to the upward mobility of women. She specifically listed the Headquarters-Field Interchange program, the Management Associate program, the Management Trainee program, the Office-in-Charge program, a professional and specialist program to develop specialized skills of individuals, and other extensive training programs including classroom, on-the-job training, and correspondence courses.

85. Finally, Ms. George stated that being a woman had not adversely affected her

---

13. Ms. George is not a class member. Because she participated in the decisions involving Ms. Valentino's individual claim, Ms. George has been excluded from the class certified herein by virtue of her adversarial relationship to Ms. Valentino.

advancement through the ranks of the USPS. In July 1966, Ms. George started as a GS–7 with the Postal Service; her salary was $6,500. Today, Ms. George is a PCES–II, the highest level in the USPS; her annual salary is over $50,000.

### 9. *Programs to Assist the Advancement of Women.*

86. The unrebutted testimony of several other witnesses confirms the observations of Ms. McCarthy, Ms. Robinson, and Ms. George. The USPS has instituted numerous programs to facilitate the advancement of women into its higher level positions.

87. One of the most effective means of assisting the advancement of women in the Postal Service has been the Essential Vacancy System. The advertising of positions which is required under the Essential Vacancy System makes women aware of available vacancies and gives interested women the opportunity to apply for those vacancies. The use of Review Committees has had a salutary effect on the advancement of women at levels 17 and above in USPS Headquarters. By allowing the input of several different individuals, the personal prejudices, bias, and opinions, if any, of a single individual are minimized. Moreover, the use of women on Essential Vacancy Review Committees allows women to become involved in the promotion process and thereby gain confidence and familiarity with the factors that will be considered for promotions.

88. Plaintiff attacks the subjectivity, flexibility, and absence of extensive paper work as flaws in the Essential Vacancy System. What plaintiff characterizes as "flaws" seem to the Court to be necessary, practical, and expected attributes of an effective promotion system for high-level management employees in an organization as large and extensive as USPS Headquarters. Even if one were to assume such characteristics are arbitrary and somehow evidence poor management judgment, there is no evidence that these factors are used to discriminate against women as a class. Instead, the Essential Vacancy System, since its inception in January 1976, has been an effective instrumentality in facilitating the advancement of women in the USPS.

89. The importance of field experience in facilitating advancement to upper level management positions in the Postal Service Headquarters was recognized by several witnesses. Several programs which assist women in obtaining field experience to make them more competitive for promotions to high-level management jobs have been developed and made operational. Specifically, the Headquarters-Field Interchange program allows employees to move temporarily from Headquarters to field assignments. Similarly, the Officer in Charge ("OIC") program allows women to obtain temporary field management experience by running an actual field Post Office, the operational arm of the USPS. Temporary assignments also have been used to move employees into functional areas with which they would otherwise be unfamiliar, to move employees to the field for valuable field experience, and to move employees into managerial positions where they can obtain important supervisory experience.

90. The USPS has also instituted a professional and specialist program which allows employees who lack professional and specialized skills to acquire these skills by serving in those positions on a probationary status for up to two years and thereby become qualified for professional and specialist positions.

91. Training programs have also been developed to assist in upward mobility. In addition to technical, classroom, on-the-job, and correspondence course training, special EEO related training is conducted. For example, seminars are held to give advice to employees on how to prepare resumes and how to present themselves effectively to Review Committees. Additionally, Headquarters managers are given EEO training.

92. At the top levels of training the USPS has the Executive Leadership Program, which sends high level management employees to extensive courses offered at various universities such as Cornell, Virginia, and Harvard. For every year for which full data is available, women employees

have been selected to participate in this program at rates more favorable than their male counterparts. Plaintiff's Exhibits 2, 14, 15, 16, and 71 reflect the following regarding the Executive Leadership Program:

| Year | % Women Available | % Women Nominated | % Women Selected |
|------|-------------------|-------------------|------------------|
| 1977 | 2.76% | 11.76% | 18.18% |
| 1978 | 3.07% | 5.13% | 5.88% |
| 1979 | 3.68% | 4.26% | 12.50% |

These figures demonstrate the Executive Leadership Program has been used effectively by the USPS to train high-level women managers for assuming greater managerial responsibility.

93. High-level employees such as the Postmaster General and his deputy, Mr. Conway, personally meet with USPS managers to impress upon them the importance of EEO obligations and the importance of their performance with regard to upward mobility for women and minorities. This high-level emphasis on EEO performance is also translated into tangible incentives for employees. Managers are rated annually on their EEO performance as part of the merit evaluations upon which their merit salary increases are based. The EEO records of candidates for high-level promotions are given close scrutiny by Review Committees and selection officials. The USPS policy of evaluating individuals on the basis of their EEO performance, was, in part, a motivating factor behind Mr. Hagburg's aggressive search for female applicants, one of whom was Ms. Valentino.

94. The USPS' efforts to increase the representation of women in the higher level ranks are reflected in the statistical evidence which has been presented in this case. The Court next considers that evidence.

## B. *Statistical Evidence.*

### 1. *Background.*

95. The statistical evidence presented to the Court came from two sources which were available to both plaintiff and defendant: computer tapes and Essential Vacancy files.

### a. *Computer Tapes.*

96. John Hyatt, General Manager of the Employee and Labor Relations Information Systems Division, USPS Headquarters, provided to the experts retained by both parties the computer data. The parties and their experts made extensive use of the computer data which was reproduced on certain computer tapes provided by the USPS. The first computer tape which was utilized by the parties was provided by Mr. Hyatt in late 1978 or early 1979. It contains Type I records with "snapshot"[14] data regarding employees as of June 1974, March 1975, January 1976, January 1977, and January 1978. Additionally, it contains Type II records with historical information regarding employees who were at the USPS at the time the tape was prepared or who had left the USPS not more than 54 weeks prior to the time the tape was prepared. A second computer tape was provided by Mr. Hyatt to both experts in October 1979. This tape contained Type I, snapshot, data for January 1979, and October 1979. In both instances, Mr. Hyatt forwarded the tapes containing the identical relevant data to the parties' experts at the same time and retained a third tape containing the same information for himself.

97. Mr. Hyatt was made available to advise both plaintiff's and defendant's experts regarding technical questions or problems which might arise in their use of the tapes. Mr. Hyatt answered both experts' questions in the same fashion, and gave both the same explanations and information. Moreover, he advised both experts whenever relevant information concerning use of the tapes was brought to his attention.

### b. *Essential Vacancy Files.*

98. The Court has also reviewed data collected manually from Essential Vacancy files kept at the USPS Headquarters. By USPS regulation these files are normally

14. "Snapshot" data, from the Type I records, reflects certain characteristics of USPS Head-

quarters' employees as of a given date.

maintained with the Department filling the vacancy. In the course of discovery in this case, these files were collected and stored in the Personnel Office for USPS Headquarters under the direct supervision of Steven Moe, Manager of the Personnel Discipline Branch in the Employee Relations Department of the USPS Headquarters.

99. Mr. Moe supervised the collection of all Essential Vacancy files in the possession of the USPS for all positions advertised in USPS Headquarters, Washington, D.C. SMSA, at levels 17 and above. As a result of careful and thorough canvassing of all Headquarters' Departments, Mr. Moe accounted for all the promotion files which were created from the inception of the Essential Vacancy System in January 1976, until late October 1979. All files in the USPS' possession were made available to plaintiff's attorneys and their support personnel for review and inspection from the time they were collected, beginning in September 1979, until the time of trial.

100. When plaintiff originally requested (in her Second Set of Interrogatories) certain data which could only be obtained from these files, the USPS made the files available for review by plaintiff's counsel. Subsequently, plaintiff requested additional information from these files, including applicant flow data. Pursuant to an agreement between counsel, the USPS made the first compilation of data requested by plaintiff from these files on the understanding that both parties would subsequently work to obtain the most accurate data possible. Under Mr. Moe's supervision, a group of nine clerical and professional USPS employees hurriedly assembled these data on a form provided by plaintiff's counsel and forwarded the "first cut" of information to plaintiff on November 2, 1979, which admittedly contained some inaccuracies.

101. Immediately after forwarding this first draft of data to plaintiff's counsel, Mr. Moe began a personal review of every relevant promotion file which had been collected. Mr. Moe found errors in the data which had been forwarded to plaintiff. He corrected every error he found. On November 30, 1979, plaintiff's counsel gave Mr. Moe a list of 46 "corrections" to "errors" which they had found in the November 2 compilation. Mr. Moe reviewed these "corrections". He then corrected all errors that plaintiff's counsel had found which he had not already corrected. Plaintiff's counsel's "corrections," many of which were themselves erroneous, were the only attempt plaintiff made to insure that the data extracted from the Essential Vacancy files were as accurate as possible. Plaintiff's counsel and support personnel had continuous access to these files, had originally agreed with defendant's counsel to work toward compiling from these files the most accurate applicant flow data possible, and had complete access to Mr. Moe who was willing to, and did, correct any and all errors brought to his attention and answer any and all questions raised by plaintiff's counsel.

102. The information which has been collected from the Essential Vacancy files is the most accurate applicant flow data for Essential Vacancy promotions available in the USPS. The information is not contained on computer tapes, and it can only be collected manually. Employees under Mr. Moe's direct supervision, as well as Mr. Moe himself, carefully went through the Essential Vacancy files and collected the applicant flow data used in this case. Moreover, since September 1979, plaintiff has had available the files from which these data were extracted, and plaintiff's counsel and support personnel have been free both to correct any errors which Mr. Moe may have made in extracting data and to compile their own data from these files.

### 2. *Statistical Overview.*

103. Between June 1974 and October 1979, the percentage of women at levels 17 and above, USPS Headquarters, Washington, D.C. area arose from 8.87 to 13.52. Moreover, during the same period the number of women *increased* by 34, or 21.25%, while the total number of men *decreased* by 403, or 24.52%, and the total number of employees *decreased* by 369, or 20.46%.

The percentage of women has generally increased at all levels above 17 during this period. These data are most clearly, completely, and succinctly displayed in defendant's Exhibit C, Tables I and II; the increase in women is also generally reflected in plaintiff's Exhibits 11–16. These data were obtained from the Type I snapshot information on the computer tapes supplied to both parties' experts by Mr. Hyatt. The snapshot figures which provide this overview are as follows:

| Time | Men | Women | Total | % Women |
|---|---|---|---|---|
| June 1974 | 1643 | 160 | 1803 | 8.87 |
| March 1975 | 1690 | 177 | 1867 | 9.48 |
| January 1976 | 1750 | 199 | 1949 | 10.21 |
| January 1977 | 1644 | 184 | 1828 | 10.06 |
| January 1978 | 1586 | 189 | 1775 | 10.64 |
| January 1979 | 1214 | 177 | 1391 | 12.72 [15] |
| October 1979 [16] | 1240 | 194 | 1434 | 13.52 |

Defendant's Exhibit C, Tables I and II.

104. Thus, while the work force was shrinking, the USPS increased the representation of women in levels 17 and above at USPS Headquarters in the Washington, D.C. area both in absolute numbers and in terms of percentages. These increases—accomplished during a period when the opportunities for advancement were limited as a result of the shrinking work force—cannot be reconciled with the contention that women competing for these positions were at a disadvantage because of gender. Plaintiff's contention must be rejected.

3. *Promotion Statistics.*

a. *The Essential Vacancy System Statistics.*

105. From the inception of the Essential Vacancy System in January 1976 until October 1979, there were 976 vacancy announcements for positions at levels 17 and above at USPS Headquarters, Washington, D.C. SMSA. Eighty of these postings were either cancelled, filled by lateral transfers, or otherwise not filled by promotions,[17] and 65 of the postings had not been filed at the time the data were compiled. Thus, 831 Essential Vacancy Announcements resulted in promotions to jobs at level 17 or higher, USPS Headquarters, Washington, D.C. SMSA.

106. The USPS does not have complete vacancy files on all of these 831 vacancy announcements. As reflected in the testimony and defendant's Exhibit B, 166 of these files have been reported as destroyed and another 86 of these files do not contain complete applicant flow data. In all, the USPS has complete applicant flow data for 579 Essential Vacancy promotions. Thus, it

15. For January 1979, plaintiff's figures reflect approximately 150 more males than defendant's figures. *Compare* defendant's Exhibit C, Table I with plaintiff's Exhibit 16. Upon learning of this discrepancy, defendant's experts rechecked their figures and compared them with similar ones prepared by Mr. Hyatt from the computer tapes which he had retained at the USPS. Defendant's figures agreed with Mr. Hyatt's figures. Plaintiff's experts made no efforts to check their figures with Mr. Hyatt or with defendant's experts. There was no testimony that plaintiff's experts made a second check on their figures after learning of the discrepancy with defendant's figures. Accordingly, the Court accepts defendant's figures, as confirmed by Mr. Hyatt in an independent check, as accurate figures for this period.

16. Plaintiff was provided data for October 1979 and January 1979 on the same date and at the same time as defendant. Plaintiff, however, did not present these data to the Court in any of her exhibits.

17. The cover page of defendant's Exhibit B reflects that 81 positions fall in this category; however, a review of Exhibit B shows that the 1976 entry for this category should be "14" rather than "15" which is incorrectly reported on the cover page of defendant's Exhibit B. Thus, a total of 80 postings were cancelled, or otherwise not filled by promotions from January 1976 through October 1979.

is possible to track completely the sex of applicants, those certified by the Review Committee to the selecting officials, and those selected, in 579 of the 831 promotion actions which have been advertised under the Essential Vacancy System.

107. A review of those 579 files reveals that *both* male and female employees applied for only 304 of the 579 vacancies. An analysis of these 304 files reveals that 26.5% of the applicants for positions for which both men and women applied were women; 29.2% of those certified by Review Committees were women; and 30.7% of those actually selected were women. Simply stated, the available applicant flow data establish that, in every one of the four years in which the Essential Vacancy System has been used, if both a woman and a man apply for a position, the woman was more likely to be recommended than the man by the Review Committee and more likely to be selected by the selecting official.

108. The figures are as follows:

| Year | % Female Applicant | % Female Certified | % Female Selected |
|------|-----------|-----------|----------|
| 1976 | 19.5 | 26.1 | 23.1 |
| 1977 | 29.6 | 33.0 | 33.7 |
| 1978 | 27.3 | 28.1 | 28.0 |
| 1979 | 26.9 | 28.4 | 35.9 |

The obvious conclusion is that women were *not* being unfairly treated in comparison to men when they applied for promotions under the Essential Vacancy System.

109. Defendant's expert Dr. Robert Hill ran several statistical analyses based upon the Essential Vacancy file data contained in defendant's Exhibit B. Dr. Hill's analyses examined all aspects of the Essential Vacancy Systems at USPS Headquarters, and he concluded that women were, in fact, doing far better than men under the system.

110. In Table V of defendant's Exhibit C, Dr. Hill ran several statistical analyses based upon the applicant flow data found in defendant's Exhibit B. Table V compared applicants to those certified under the Essential Vacancy System, when both men and women applied for a job. As Dr. Hill testified, when both men and women apply for a job—that is when the Review Committee has an opportunity to select from both male and female applicants—women are statistically more likely to be certified than men.

111. In Table VI of defendant's Exhibit C, Dr. Hill examined certifications and selections, by department, for those positions for which both men and women applied. For example, when both men and women applied for jobs in the Employee Relations Department, where Ms. Valentino worked, 23.35% of the applicants were women, 26.82% of those certified by the Review Committee were women, and 30.16% of those selected to fill positions were women. In Tables VIA, VIB, and VIC, Dr. Hill ran statistical tests which compared applicants to those certified, applicants to selectees, and those certified to selectees. In each instance, at each level in the process, when analyzed for all departments in USPS Headquarters, women who applied for jobs fared better under the Essential Vacancy System than their male competitors.

112. In Table VII of defendant's Exhibit C, Dr. Hill examined, by USPS Headquarters' departments, the actions of selecting officials under the Essential Vacancy System. In these tables, Dr. Hill examined only those Essential Vacancies reported in defendant's Exhibit B for which both men and women were certified by Review Committees. Table VII indicates that when both men and women are certified for Essential Vacancy positions in USPS Headquarters, women are 29.21% of those certified and 30.67% of those selected. In the Employee Relations Department, where Ms. Valentino's individual claim arose, women were 34.76% of those certified by Review Committees and 41.67% of those appointed by selecting officials. Thus, the figures again demonstrate that, when given the opportunity, selecting officials, like Review Committees, select women at a higher rate than their male competitors. Moreover, Dr. Hill's statistical analysis of those data, as reflected in Table VIIA of defendant's Exhibit C, again reflects that when they are

certified by Review Committees, women had a better opportunity than men to be selected for Essential Vacancy positions throughout USPS Headquarters.

113. Plaintiff did not submit any statistical analyses of the Essential Vacancy file data, even though through discovery plaintiff initially required the USPS to compile the data; she had complete access to all Essential Vacancy files; and she had once contemplated reviewing the files to ensure that they were accurately analyzed. Instead, having been given access to the Essential Vacancy System data, she decided to challenge the USPS' use of Essential Vacancy files. Her efforts to discredit the Essential Vacancy file data miss the mark for several reasons.

114. First, most of plaintiff's efforts to discredit Mr. Moe's compilation of data involved a comparison between a first draft of data containing inaccuracies which was forwarded to plaintiff on November 2, 1979 (plaintiff's Exhibit 139), and defendant's Exhibit B which contains the only Essential Vacancy file data on which defendant has relied. Given that plaintiff's Exhibit 139 was hastily prepared by the USPS pursuant to an agreement with plaintiff's counsel and was intended to be only an "initial cut" of the data reflected in the Essential Vacancy files, and admittedly contained some inaccuracies, the Court finds that plaintiff's Exhibit 139 does not impeach the accuracy of defendant's Exhibit B. Moreover, much of this attempt to discredit the Essential Vacancy data concerns alleged mistakes that would not affect the statistical analyses defendant has made. Since defendant analyzed only files for which both men and women applied, only inaccuracies in those files would affect defendant's analyses. In large part plaintiff's attack ignores this important point.

115. Second, plaintiff argues that defendant's failure to take into account multiple applications by the same individual and multiple certifications by the same Review Committee impeaches the Essential Vacancy file data in this case. The Court disagrees. Defendant's count of applications was the same for males and females. Similarly, defendant treated Review Committee certifications the same regardless of the sex of those certified. In both instances defendant's analysis is the clearest, most direct way to deal with the Essential Vacancy data and is completely sex blind. Moreover, although plaintiff had full access to these data, she did not introduce any evidence to show that performing the highly complicated, potentially error-filled analyses she has suggested would alter the conclusion that women were not being discriminated against under the Essential Vacancy System.

116. Third, plaintiff argues that defendant may have identified a man as a woman, and vice versa, and that this should discredit the Essential Vacancy data. The Court finds this argument unpersuasive. Both men and women were identified by Mr. Moe in the usual manner. There is no reason to suspect that any misidentifications occurred; indeed, plaintiff did not identify even one such instance for the Court or Mr. Moe. Moreover, if such speculative misidentifications did occur, there is no reason to suspect that more women were misidentified than men, or vice versa.

117. Finally, plaintiff seeks to discredit defendant's Essential Vacancy file data by noting that 166 of the Essential Vacancy files have been reported as destroyed and 86 of these files have been reported as containing incomplete data. There is no evidence, however, that these files have been selectively destroyed or altered based on their content. Almost all of the destroyed (157 out of 166) and incomplete (59 out of 86) files are from 1976 and 1977. This is readily explained. Under the USPS record destruction regulations in effect during 1976 and 1977, Essential Vacancy files could be routinely destroyed after six months. In contrast, only nine of the files from 1978 and 1979 were destroyed. This is also understandable. On July 5, 1978, shortly after the Court certified the class in this case, the USPS issued a record preservation order that suspended all routine destruction of relevant Essential Vacancy files.

118. There is no indication that any missing files contain data which would alter the picture presented by those files for which data are available. When the USPS requested selecting officials to provide those Essential Vacancy files in their possession, no mention was made of why those files were being requested, the case for which they were requested, or the use to which these files would be put. Any speculation that these officials took sex biased steps which would have altered the results reflected in defendant's Exhibit B is completely without foundation. At least three sources confirm this. First, the Essential Vacancy file applicant flow data for 1976 and 1977, the years when the largest number of incomplete or destroyed files exist, are of the same nature and type and contain much the same percentages as applicant flow data for the year 1978 and 1979 where very few destroyed or incomplete files have been noted. Second, in early 1977, Mr. Carlin had a study made to examine, nationwide, the effect of the Essential Vacancy System on both women and minorities during 1976, the system's first year of operation. The study showed that the percentage of women selected was higher than the percentage of women who applied for positions advertised under the system. This separate, independent study is completely consistent with the 1976 data reported in Defendant's Exhibit B. Finally, plaintiff's "grade increase" exhibits confirm that defendant's Essential Vacancy file exhibits accurately show that since the inception of the Essential Vacancy System in January 1976 women have not been the victims of sex discrimination in promotions to positions at levels 17 and above at USPS Headquarters.

119. The statistics reflected in Defendant's Exhibits A and B, and Tables V, VI, VIA, VIB, VIC, and VIIA, of Defendant's Exhibit C show that women are being overwhelmingly *favored* in the Essential Vacancy System. A substantial error rate would have to be found, having a significant sex bias against women to alter these figures. No testimony or exhibits have been introduced which would indicate that there is any error rate in these figures, much less an error rate of the kind of magnitude and bias which would alter the conclusion that USPS women are not being adversely treated under the Essential Vacancy System.

b. *Plaintiff's "Grade Increase" Exhibits.*

120. Plaintiff's Exhibits 19–25 and 67–70 are the only exhibits that plaintiff introduced which attempt to focus on the issue of this case—a comparison of "grade increase" (*i. e.*, promotions) of men and women in USPS Headquarters over a specific period of time. These exhibits, prepared from data on USPS Type I computer records, reflect the number of grade increases that went to men and women employed at the USPS Headquarters over various time periods beginning in June 1974, more than two years prior to the filing of the administrative charge in this case.

121. Plaintiff's exhibits contain certain crucial shortcomings which limit, if not destroy, their utility in measuring the relative advancement rates of similarly situated men and women. Plaintiff's exhibits simply compare men, in general, against women, in general. Plaintiff has made no effort to take into account the numerous different occupations which these men and women hold. Accordingly, these statistics do not allow the Court to see what occupations accounted for the most promotion opportunities or to determine the sex of those individuals qualified to receive those promotion opportunities. Likewise, plaintiff's exhibits do not allow comparisons of similarly educated individuals. Additionally, these figures make no effort to compare male and female applicants competing for the same jobs. Nor do they recognize that there were more men employees than women employees in this group and more men applicants for promotion.

122. The class which has been certified in this case contains individuals with a wide variety of educations, qualifications, and occupations. Some idea of the wide variety can be seen from Defendant's Exhibit B which lists the various job titles of positions that have been filled through the Essential

Vacancy System since January, 1976. See also Plaintiff's Rebuttal Exhibit R24. The grade increases which plaintiff has identified in her Exhibits 19–25 and 67–70 have gone to a wide variety of different people, in a wide variety of different jobs, with a variety of different qualification requirements. Economists, computer experts, business managers, personnelists, engineers, statisticians, lawyers, accountants, and secretaries all are among the individuals in many different occupations who received the grade increases reflected in plaintiff's exhibits. However, as plaintiff's exhibits also reflect, Plaintiff's Rebuttal Exhibits 22–24, the mix of men and women in these various job occupations and the sex of the people qualified for these grade increases varies greatly from job to job. Of course, it would be unreasonable to expect a secretary to be qualified to be promoted into a lawyer's position, a personnelist to be promoted into an engineer's job, or a computer expert to receive a promotion as an accountant. Nonetheless, these are the assumptions which plaintiff's promotion exhibits require the Court to make. Simply stated, plaintiff has made no effort to identify the relevant labor pool from which these grade increases were made; thus, it is impossible to determine from plaintiff's statistics whether *similarly situated* and *similarly available* men and women have been treated differently from each other.

123. Defendant's promotion evidence, based on *actual* applications for positions, does not contain the flaw of undifferentiated, gross comparisons which plaintiff's promotion exhibits reflect. Both men and women can be presumed to apply for jobs in their occupational area; at least, there is no evidence that more unqualified people of one sex apply for positions than unqualified people of the other sex. The unrebutted testimony is clear that Review Committees eliminate unqualified applicants and give weight to important factors such as experience, education, and job performance. None of these relevant considerations is reflected in plaintiff's Exhibits 19–25 or 67–70.

124. Despite their shortcomings, plaintiff's promotion exhibits confirm that since January 1976, when the Essential Vacancy System was established, no statistically significant difference exists between the promotions which have gone to men, as a general group, and to women, as a general group. Plaintiff's Exhibits 67–70. Thus, plaintiff's approach confirms defendant's statistical evidence that the Essential Vacancy System has in no way operated as a tool for sex discrimination against women. Indeed, no evidence has been introduced in this case which shows that since, at least, January 1976 women have received any adverse treatment in promotions at the 17 and above levels, USPS Headquarters, Washington, D.C. SMSA.

### 4. *Defendant's Cohort Analyses.*

125. Defendant's expert, Dr. Hill, also testified about two "cohort analyses" which were prepared as exhibits for defendant in this case. In his cohort analyses, Dr. Hill analyzed the relative movement of men and women through the USPS from January 1974 or a later date, as applicable, until October 1979. He did this by comparing the movement of men and women with similar service computation dates from the same starting levels on January 1, 1974 (or the same level at a similar subsequent starting date) until October 1979. Thus, Dr. Hill was able to compare roughly the movement of people with similar lengths of government service, starting from the same levels, and over the same periods of time. Although Dr. Hill readily admitted that this analysis did not take into account all factors which influence the progress of an individual in the USPS, it does account for service computation date, starting level, and time—far more factors than most of plaintiff's exhibits attempted to examine. When men and women with similar lengths of government service and similar starting levels with USPS Headquarters are compared over similar time periods—with regard to both ending level and ending salaries the ending places of the males and ending places of the females are indistinguishable statistically.

126. Plaintiff primarily attacks Dr. Hill's cohort analyses by arguing that it is a "sample" which examines too few people. It is undisputed that not every person employed at USPS Headquarters between January 1974 and October 1979 was included in defendant's cohort studies. Some men and women were not included because there were no male or female counterparts against whom to measure their progress. Other men and women were not included because they left the USPS at various times prior to October 1979. Dr. Hill's reasons for not including these people were clear and simple: in order to be counted in a cohort study there must be a "peer" or person with similar characteristics of the opposite sex to compare an individual with over a similar time frame. Accordingly, those men and women who had no peers against whom to compare their progress were not included in Dr. Hill's cohort studies. As Dr. Hill testified, his cohort studies were not based on "samples"; they were, rather, complete analyses of every individual, man or woman, who could be compared with a peer over a similar time frame ending October 1979.

127. Plaintiff also argues that Dr. Hill's cohort study could have been more useful and would have included more people had he attempted to study movement from January 1, 1974, until January 1, 1976, rather than October 1979. As Dr. Hill explained, such a study would not have given the individuals involved a long enough period of time to move and thus would not have given enough observations of movement to have been as meaningful as the longer time frame which he used.[18] At any rate, plaintiff had full access to the same computer tapes as defendant. If she felt that an alternate method of computing a cohort study was more significant than Dr. Hill's method, or would have yielded a more favorable result for her claims, she was free to make such computations. Plaintiff chose not to introduce such evidence. The Court will not speculate or assume that other cohort analyses would have yielded a different result than Dr. Hill's.

5. *Plaintiff's "Snapshot", "Hiring," and "Education" Exhibits.*

128. Although many in number, all of plaintiff's exhibits generally repeat the same theme: in USPS Headquarters at the 17 and above levels, there are a larger percentage of women in the lower levels than in the upper levels. Since persons in upper level positions are generally paid more than those in lower level positions, plaintiff's proof also reflects that the percentage of women in lower paying jobs is greater than the percentage in higher paying jobs. Defendant does not dispute these observations but correctly points out that this sex distribution is neither unusual nor is it the result of USPS discrimination.

129. First, the percentages of men and women vary widely from occupation to occupation in both the USPS and the national work force. For example, the majority of the secretaries are women whereas the majority of lawyers and engineers are men. Similarly, the percentages of men and women vary widely in occupations such as accountants, computer personnel, and managers. All these jobs are represented at levels 17 and above in USPS Headquarters. Moreover, the concentration of different jobs varies widely at each level in the USPS. As Dr. Hill testified, an analysis of the occupations found at levels 17 and above in USPS Headquarters indicates that the mix of jobs varies at each level *and* that, as it would in the national work force, the sex makeup at each level varies widely. As Dr. Hill further testified, because of the mix of jobs and the varying sex makeup of these jobs—using national work force figures—the percentage of women performing the jobs found at the various USPS levels decreases significantly as the level increases. There is no basis for assuming that a nondiscriminatory USPS promotion policy would result in an equal distribution of men

---

**18.** Additionally, the relative movement of men and women during that limited period is be- yond the scope of this lawsuit.

and women at each level. Indeed, all the evidence would suggest to the contrary since that result would be out of step with the national work force.

130. The mix of people at each Postal Service level is the result of many possible, indeed likely, factors other than a discriminatory employment policy. First, as discussed above, the qualifications and interests of individuals vary widely—and are not equally distributed between the sexes. Second, whether an individual applies for a job has a great effect on whether that individual will be promoted. As Ms. Valentino herself admitted, many women would not apply for job openings in the USPS and had only themselves to blame for their failure to be promoted. Third, despite USPS efforts to encourage women to break into new fields where greater opportunities existed, such as mail processing and delivery, women have tended to seek "replacement jobs" in occupations traditionally filled by women. Fourth, the Veterans' Preference Act has been an obstacle to women entering the USPS at lower entry-level jobs from which the 17 and above jobs are ultimately filled. Fifth, events that occurred long before Title VII ever became applicable to the USPS, events that occurred long before the filing of Ms. Valentino's charge in this case, and events that occurred outside the USPS have all helped shape the present distribution of jobs at various levels in the USPS. Thus, it is of little probative value for plaintiff to prove simply that men and women are not equally distributed throughout the 17 and above levels of USPS Headquarters.

a. *Plaintiff's Exhibits 1, 3–18.*

131. These exhibits generally reflect various snapshot data obtained by the plaintiff from the computer tapes supplied by the USPS.[19] On the basis of these exhibits, plaintiff concludes, with a large degree of statistical confidence, that the USPS does not fill its positions, or assign salaries to individuals, in a random fashion. Not surprisingly, the USPS has never contended that it fills its jobs randomly, nor has anyone ever contended that it should fill its job in such a fashion. Apparently, plaintiff's underlying hypothesis is that in a sex neutral system, the mix of sexes would be equal at each level, 17 and above, in USPS Headquarters. There is, however, no evidence upon which the Court can conclude that this underlying hypothesis is correct. Indeed all the evidence indicates that it is not. Plaintiff's expert, Dr. Joseph Gastwirth, conceded that plaintiff's Exhibits 1 and 3–18 were not, standing alone, probative of anything highly relevant to this case. It is for that reason that Dr. Gastwirth decided to run his other statistical tests.

b. *Plaintiff's Exhibits 26–32.*

132. These exhibits purport to identify males and females "hired" into various levels at USPS Headquarters. Plaintiff identified her "hires" from Type I computer tape data. The USPS, however, has not "hired" the number of people that are reflected in plaintiff's hiring exhibits. As Mr. Hyatt explained to plaintiff's experts, Type I computer records do not provide accurate "hiring" information. Moreover, since November 1975 there has been a general hiring freeze at USPS Headquarters at the 17 and above level.

133. Plaintiff's "hiring exhibits" have mixed "hires"—that is people who are new to the USPS—with transfers—that is people who have come into USPS Headquarters from other jobs in the USPS which are outside of Headquarters. Because of this error, plaintiff's "hiring" exhibits have no probative value in this case.

134. Although at trial plaintiff recognized this error and began calling her "hiring" exhibits "initial placement" exhibits, this nomenclature change does not give meaning to these exhibits. It is impossible to conclude from these exhibits, as plaintiff would have the Court do, that women are being improperly placed at lower levels in the USPS than are their male counterparts. There simply is no evidence in these exhib-

---

**19.** As noted above, plaintiff has erroneously inflated by 150 the number of males employed by USPS Headquarters at the 17 and above level for January 1979.

its upon which the Court can draw that conclusion. Like numerous other of plaintiff's exhibits, plaintiff's Exhibits 26–31 take into account only sex. No effort has been made to determine where these individuals came from, what their qualifications were, and thus where they should "properly" be fitted into the USPS structure. The flaws which pervade most of plaintiff's other exhibits are also present in her "hiring" or "initial placement" data. There is no labor pool data which will justify the conclusion that *similarly situated* and *similarly available* men and women are being treated differently in initial placement assignments at USPS Headquarters.

### c. *Plaintiff's Exhibits 32–43.*

135. In these exhibits plaintiff attempts to compare USPS employees of different sexes by using certain educational data which is reflected on the USPS computer tapes. In so doing, plaintiff has relied on educational data which she admits she was told are not accurate. Indeed, when one examines the educational data on plaintiff's Exhibits 32–43 these errors seem manifest.

136. For example, according to plaintiff's Exhibit 34, in January 1976, men who had completed elementary school had a higher average grade than men who had completed college. Similarly, plaintiff's Exhibit 32 reflects that in 1974 men who had completed elementary school had a higher average grade than any other educational group except men with Ph.D.'s or advanced degrees. Likewise, for January 1974, women who had some high school education (but had not completed it) are shown as receiving a higher average wage than women with a college degree. Plaintiff's Exhibit 38. These illogical comparisons occur throughout plaintiff's Exhibits 32–43. They confirm what the USPS told plaintiff: the computerized educational data is inaccurate. Because of these inaccuracies, the Court finds that these exhibits are entitled to no weight.

137. Moreover, as with plaintiff's other exhibits, plaintiff's Exhibits 32–43 do not group people by job categories in an effort to determine whether, for example, women computer experts with the same amount of education, the same amount of government service time, and the same entry dates at the USPS. Moreover, these "education" exhibits do not reflect the type or quality of education. Thus, for example, a person who completed two years of secretarial school, such as Mildred Oliver who testified at trial, is compared with a person who has completed two years of business school. In short, even were the data on these exhibits accurate, so many important variables are omitted that they are of little if any value to the Court in determining whether women are being discriminated against at USPS Headquarters.

### d. *Plaintiff's Exhibits 44–49.*

138. In these exhibits plaintiff combines her inaccurate "hiring" data, *supra*, with her inaccurate and incomplete educational data. This combination of two inaccurate pieces of information creates tables that are of no utility in deciding the issues of this case.

139. These exhibits incorrectly identify "transfers" as "hires", use admittedly inaccurate educational data, and ignore crucial factors such as occupations, labor pools, applications, prior experience, and relevant time periods, all of which are errors characteristic of her other exhibits which have been reviewed by the Court.

### 6. *Regression Analyses.*

140. Plaintiff's Exhibits 50–65 are a series of regression analyses which form the centerpiece of plaintiff's statistical case. In these analyses plaintiff attempts to measure the salaries of USPS employees taking into account the following variables: length of government service, education, and special degree.[20]

---

**20.** As Dr. Hill testified, plaintiff's special degree factor was nonsense. The "special degree" factor simply depended on whether an employee had indicated on a form, at some point in time, what special degrees he or she had, if any. Thus, a college graduate who put "history" down as a special degree would be treated differently than a college graduate who was a history major but chose not to fill in his or her major.

141. Dr. Gastwirth, plaintiff's expert, admitted that his regression analyses did not take into account many factors which would logically affect an employee's salary. For example, acts which occurred prior to 1972 (when Title VII became applicable to the federal government and the USPS) are included in plaintiff's regressions. Additionally, acts which occurred outside the USPS could logically have an impact on the present salary of a USPS employee but are not factored out of plaintiff's regression. Moreover, plaintiff made no effort to capture other relevant factors such as occupation, age (which would to a degree reflect the experience of an individual), time in level (which would reflect how an individual had advanced in pay in his or her level), and, most importantly, the level at which an individual was employed.

142. The value of a regression analysis is, to a large degree, measured by how well it describes the phenomenon it is seeking to measure, in this case salaries at the USPS. This measurement is quantified as the regression's "R square." As Dr. Hill testified, one generally seeks to obtain a high "R square" with a regression analysis. For measuring a phenomenon as complex as salaries, Dr. Hill testified that a desirable "R square" would be approximately .9. Because of the large number of items which Dr. Gastwirth chose to exclude from his regressions, plaintiff's "R squares" were far below .9. For example, plaintiff's Exhibit 61, which was a regression for employees at the 17 and above levels, USPS Headquarters, as of January 1979, had an "R square" of .284. Dr. Hill testified that this was a "very, very low R square". *Hill*, Tr. VII at 72. Dr. Gastwirth admitted that this figure meant that 71.6% of the salary of these employees was *not explained* by his regression model. In view of the many other explanatory variables which Dr. Gastwirth could have added to his regression equation, the Court cannot give any weight to a regression that is admittedly unable to describe so much of the salary of USPS employees.[21]

143. Dr. Hill ran a regression analysis in an attempt to measure the salaries of USPS Headquarters employees at the 17 and above level as of October 1979. Dr. Hill's analysis measured many more variables than Dr. Gastwirth's; for example, it included age, time-in-level, and level, as well as the government service and educational variables Dr. Gastwirth used. Dr. Hill's regression yielded an "R square" of .882, far higher than Dr. Gastwirth's regressions. Moreover, Dr. Hill concluded, based on his regression study, that sex was not a statistically significant factor in predicting what an employee's salary would be. Dr. Gastwirth ran Dr. Hill's regression for January 1979 employees and also reached the conclusion that sex was not a statistically significant factor in determining the salaries of USPS Headquarters employees as of January 1979.

144. Dr. Gastwirth and Dr. Hill differed markedly on whether it is appropriate to use the "level" of an employee in a regression study. There can, however, be no dispute that an employee's grade level affects his or her salary. Dr. Gastwirth refused to use level on the theory that it was a "tainted" variable. There is no evidence to support Dr. Gastwirth's conclusion that the level of men and women employees is "tainted." His assumption that level is "tainted" is based on the earlier discussed assumption that men and women should be equally distributed among all levels of the USPS. As earlier discussed, however, there is no evidence to support this assumption; indeed all the evidence in this case is that such an assumption is completely unrealistic. The undisputed evidence—as opposed to unproved assumptions—is that the mix of men and women varies widely from job to job

21. This is not a case in which a low "R square" can be excused on the theory that the plaintiff has "included all seemingly relevant factors identified through discovery" and thereby passed the burden to the defendant to bring forward additional bona fide qualifications. "Beyond The Prima Facie Case In Employment Discrimination Law: Statistical Proof and Rebuttal," 89 *Harv.L.Rev.* 387, 408 n.89 (1975). Plaintiff chose to use only a few factors reflected on the computer tapes used by both parties.

and the mix of jobs at USPS Headquarters varies widely from level to level. Due to these varying mixes, under completely sex-neutral employment policies, one would expect to see lower percentages of females at higher levels in the USPS than in the lower levels.

145. Thus, plaintiff's regression analyses fail to take into account one of the most important factors which accounts for salary—the level at which an individual is employed. Since the percentage of men and women varies from level to level in the USPS and since plaintiff has failed to take level into account in her regression analyses, the results of those analyses are suspect. Plaintiff's results are particularly suspect in this case, since all agree that the percentages of women is lower in the higher level, higher paying jobs, than in the lower level, lower paying jobs. Thus, by declining to take level into account, plaintiff has managed to make it appear that a difference in salary is attributable to sex, when that difference is properly attributable to a difference in level. It is undisputed that when level is factored into the regression equation, sex is of no statistically significant consequence in determining an individual's salary in levels 17 and above at the USPS Headquarters.

## CONCLUSIONS OF LAW

### I. *Plaintiff's Individual Claim.*

1. To prevail on her individual claim, plaintiff must establish a violation of § 717(a) of Title VII, 42 U.S.C. § 2000e–16(a). That subsection requires, in pertinent part, that "[a]ll personnel actions affecting employees ... in the United States Postal Service ... shall be made free from any discrimination based on ... sex ...."

2. The core of plaintiff's individual complaint involves two simultaneous USPS "personnel actions": her failure to be selected to either the position of Director, Office of Employee Services (OES), or the position of Director, Office of Human Resources (OHR).

### A. *Legal Standards.*

■ 3. This case is one alleging disparate treatment. Plaintiff alleges that personnel decisions in the USPS which adversely affected her and other female employees were motivated by gender-based discriminatory animus. While discriminatory motive is an essential element of a disparate impact case, *Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854–1855 n.15, 52 L.Ed.2d 396 (1977), it may, in the first instance, be proven inferentially rather than directly. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978); *Aikens v. USPS*, 206 U.S.App.D.C. 109 at 115, 642 F.2d 514 at 520 (1980).

4. The standards which an individual plaintiff must meet in order to establish a Title VII claim of disparate treatment are set out in *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1976); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). These cases establish that a plaintiff must first make out a *prima facie* case of discrimination. The burden then shifts to the defendant to "articulate" a legitimate reason for taking the challenged action. Subsequently, the burden returns to the plaintiff to show that the defendant's articulation is "pretextual."

■ 5. To establish a *prima facie* case of sex discrimination in promotion, plaintiff must show that (1) she belongs to a group protected by Title VII; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection the position remained open and the employer continued to seek applicants among persons having plaintiff's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Aikens v. USPS*, 206 U.S.App.D.C. 109 at 112, 642 F.2d 514 at 517 (1980). Having shown these basic facts, plaintiff is entitled to the benefit of a presumption that the decisions in question

were prompted by some unlawful motive. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

■ 6. Plaintiff has proved a *prima facie* case. She belongs to a group—namely, women—protected by Title VII. She applied for and was minimally qualified for two positions for which the USPS sought applicants. She was not selected for either of the two positions. The USPS selected two male applicants for the two positions. Thus, the burden shifts to the defendant to dispel the presumption of unlawful motive by articulating a legitimate nondiscriminatory reason for the actions taken.

7. The USPS has articulated a legitimate, nondiscriminatory reason for not selecting plaintiff for either of the two positions. Specifically, the USPS contends that plaintiff was not selected for either position because she was not the best qualified individual for either position. Plaintiff disagrees with this contention. She contends that she was the best qualified applicant for the OES position and the OHR position and therefore should have been selected for both positions. On the basis of the findings of fact made above, the Court concludes that the USPS has articulated a legitimate, nondiscriminatory reason for not selecting plaintiff for either of the two positions and plaintiff has failed to show that that reason was, in fact, pretextual.

### B. *The Evidence.*

8. Each of the two positions called for a knowledge of USPS operations. As noted above, Ms. Valentino's experience was largely with general, federal sector, personnel matters. This experience is not the equivalent of that needed in the USPS in many important respects. For example, Ms. Valentino's lack of experience in postal collective bargaining matters amounted to a serious defect in her qualifications. In contrast to Ms. Valentino's lack of experience

in collective bargaining matters, both of the men selected for the positions had been deeply involved in a variety of USPS matters, including *inter alia*, personnel, labor relations, workmen's compensation, and other important functional areas which were important responsibilities of the positions in question. Both men had spent considerable time in the field, where actual postal operations are conducted, whereas Ms. Valentino lacked entirely this important field experience. The Court credits Mr. Conway's testimony that a person with Ms. Valentino's limited postal experience would have needed a "long learning process" had he or she been promoted to either position. The Court, therefore, concludes that because Ms. Valentino was not as well qualified for the position of Director, OES, as was Mr. Weems, nor as well qualified for the position of Director, OHS, as was Mr. Gillespie, the USPS was justified in rejecting her application for those positions in favor of the applicants who were selected.

9. Plaintiff also alleges discrimination may be inferred in her nonselection from certain actions by Mr. Conway and Mr. Carlin. Her case against Mr. Conway rests on his characterization of her as an "attractive manager who conceptualizes well," and on his failure to discuss her aspirations with her prior to completing an Estimate of Potential on plaintiff for the positions in question. However, there is no reason to doubt the uncontradicted testimony of the Review Committee members that they did not interpret Mr. Conway's comments as a demeaning reference to Ms. Valentino's physical appearance and that they did not consider that factor in evaluating her for the position. Nor is there any basis for doubting Mr. Conway's testimony that he used the word "attractive" to indicate that Ms. Valentino merited attention and that he had used "attractive" to describe both male and female candidates in the past.[22] Similarly, there is no reason to infer discrimina-

---

22. Title VII does not require a total rewriting of the English language. Webster defines "attractive" as "[h]aving the power or quality of attracting." Offers, contracts, opportunities, candidates—and managers—can all be characterized as "attractive" without suggesting sex discrimination.

tion on the basis of Mr. Conway's failure to discuss Ms. Valentino's aspirations with her. The evidence is undisputed that an individual's personal aspirations were not of great significance to the Review Committee's decision regarding the particular jobs. Moreover, there is no evidence that Mr. Conway discussed any Estimates of Potential with any male applicants for either position in question. Indeed, the salient facts in this regard are that Mr. Conway evaluated a number of applicants for the positions in question and that he gave Ms. Valentino a better recommendation than some of the males he evaluated.

10. Plaintiff's case against Mr. Carlin is based on his experimental ranking of all candidates interviewed by the Review Committee. The Court is apparently asked to infer that because Ms. Valentino did slightly better when Mr. Carlin attempted to quantify the Review Committee's rankings than she did when the Committee actually ranked her, she was denied either of the two positions sought because she was a woman. However, Mr. Carlin's experimental rankings never placed Ms. Valentino higher than third for one of the two positions. Moreover, he testified that he limited his consideration of who to select to those recommended by the Review Committee. There is nothing suspicious in a selecting official allowing himself to be influenced by the recommendations of a Review Committee established precisely for that purpose. The Court sees no basis to infer from Mr. Carlin's actions that "it is more likely than not that those actions were bottomed on impermissible considerations," *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

■ 11. Ms. Valentino also contends that her reassignment after the realignment of the Employee and Labor Relations Group and after her failure to receive the promotions in question was discriminatory. However, that claim was not presented by Ms. Valentino as part of her administrative complaint. Since it is necessary under Title VII for a plaintiff to exhaust administra-

tive remedies before filing a civil action, *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), as a threshold matter the Court notes that it lacks jurisdiction of this claim.

■ 12. Assuming, however, that the Court has jurisdiction over plaintiff's realignment claim, there has been no showing that the action was discriminatory. Indeed, the uncontradicted evidence appears to be that when the reassignment was made, Ms. Valentino, along with 140 other Postal Service employees, was an excess employee. There is no showing that a better position was available for Ms. Valentino's reassignment than the one she received. Indeed, Ms. Valentino never suggested another available position to which she aspired. Moreover, the position she was given was at the same pay level as her old position, had greater supervisory responsibilities than her old position, and had important functional responsibilities in the training of the USPS work force of 650,000 employees. Plaintiff suggests that her reassignment was a downgrading because in her new job she reported to an individual lower in the USPS hierarchy than in her previous position. To demonstrate a reduction in rank, or a demotion, there must be a showing of other factors than mere reporting relations. The Court cannot conclude, contrary to the testimony of numerous USPS witnesses and the findings of the Civil Service Commission, that Ms. Valentino's reassignment was a downgrade. Nor can the Court conclude that Ms. Valentino was adversely affected by virtue of her sex in connection with this reassignment. On the contrary, the Court accepts the testimony of Mr. Carlin that Ms. Valentino's new position would have given her valuable experience for further advancement, had she not elected to leave the USPS.

13. Additionally, Ms. Valentino contends that the decision to place the women's program at a lower level in the Postal Service hierarchy was discrimination—either against her or the class of women she represents. The Court notes at the outset that a decision to move a program is not a "per-

sonnel action" within the meaning of § 717(a) of Title VII, 42 U.S.C. § 2000e–16(a). Accordingly, Ms. Valentino's dissatisfaction with the USPS organization chart placement of an affirmative action program fails to state a cause of action, unless she can show she was personally aggrieved thereby. Absent a finding of discrimination, the decision of whether an agency is to have an affirmative action plan, or where in the organizational chart it is to be placed, is a decision vested in the USPS or, in 1976, the Civil Service Commission, not the Court. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

14. Even assuming that moving the Women's Program is a "personnel action" within the meaning of Title VII, it is clear from the statistical and anecdotal evidence reviewed below, that moving the Women's Program down the organizational chart did not adversely affect the advancement of women in the Postal Service. Nor did this action adversely affect Ms. Valentino. Accordingly, the Court finds that this claim is without merit and does not state a cause of action.

15. In short, Ms. Valentino's individual claims are without merit. With regard to her central claim, she asks the Court to substitute its judgment for the five members of the Review Committee, for Mr. Carlin, the selecting official, and for Mr. Conway, the selecting official's immediate superior. These individuals concluded for valid and substantial reasons that plaintiff was not the best qualified applicant for either position. Additionally, she apparently asks the Court to create some new position to which she should have been reassigned after her failure to receive these promotions. No reason exists to take such action. Finally, she asks the Court to redesign the organizational structure of the Postal Service to suit her purposes. Even assuming the Court could do so, it is clear that such action is not warranted in this case.

**23.** Only a few level 30 and above positions in the early period of the Essential Vacancy System and a few PCES level positions since

## II. *The Class Claim.*

16. By order dated June 13, 1978, the Court limited plaintiff's allegations of sex discrimination in several respects: (1) by organization—to USPS Headquarters females; (2) by geography—to the Washington, D.C. metropolitan area (SMSA); (3) by pay scale classification—to level 17 and higher pay level; (4) by date—to post June 16, 1976; (5) by type of claim—to women denied advancement; and (6) by legal theory—to disparate treatment claims.

17. As the evidence has been presented to the Court, it is clear that plaintiff's class claim is focused on the Essential Vacancy System of the USPS. That system was implemented on January 28, 1976; was the system under which Ms. Valentino unsuccessfully competed for the two promotions at issue in her individual claim; has generally been the method of advancement for level 17 and above USPS Headquarters employees since its inception [23] and was the object of plaintiff's attack at trial.

### A. *Legal Standards.*

18. In order to prevail on her class claim, plaintiff must show that defendant has engaged in *"systematic* and *purposeful* employment discrimination continuing well beyond the effective date of Title VII"* and, given the dates of her class, from June 16, 1976, through the present. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 342, 97 S.Ct. 1843, 1858, 52 L.Ed.2d 396 (1977) (emphasis added). To establish *systematic* discrimination, she must show by a preponderance of the evidence the existence of a discriminatory policy to which all class members have been subjected: namely, that sex discrimination was the USPS' "standard operating procedure—the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. at 1855; *Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).

March 1979, have been excepted from the Essential Vacancy procedures.

19. Statistical evidence alone may be sufficient to establish a *prima facie* case of a pattern or practice of discrimination if it tends to show "gross ... disparities." *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–2742, 53 L.Ed.2d 768 (1977); *Davis v. Califano*, 613 F.2d 957, 962 (D.C.Cir.1979). Statistical disparity, however, is not a substitute for the element of discriminatory motive; it rather supplies the basic facts from which discriminatory motive can be inferred. *Teamsters v. United States*, 431 U.S. 324, 339–40 n.20, 97 S.Ct. 1843, 1856–1857 n.20, 52 L.Ed.2d 396 (1977). The mere fact that some imbalance exists in defendant's work force is insufficient since "Title VII [does not] require[ ] an employer's work force to be ... balanced." *Id.* Furthermore, such statistics are only relevant to the extent that they compare employees of similar qualifications. *Hazelwood School District v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977); *Davis v. Califano*, 613 F.2d 957, 963 n.40 (D.C.Cir.1979).

20. Assuming relevant and credible proof of statistical disparity sufficient to give rise to a presumption of unlawful discrimination, the defendant still has the opportunity to rebut that presumption by whatever probative evidence it can muster including its own statistical evidence to the contrary. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950–2951, 57 L.Ed.2d 957 (1978); *Hazelwood School District v. United States*, 433 U.S. 299, 310, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977); *Davis v. Califano*, 613 F.2d 957, 962 (D.C.Cir.1979).

21. If plaintiff can thus establish the existence of a policy of unlawful discrimination against women at level 17 and above for promotions under the Essential Vacancy System at USPS Headquarters between June 16, 1976 and the present, the Court may infer that individual promotion decisions were made in pursuance of that policy and require the USPS to come forward with evidence dispelling that inference. *Teamsters v. United States*, 431 U.S. 324, 359, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

B. *The Applicable Time Frame.*

22. As part of her statistical proof, plaintiff has sought to vindicate certain claims of sex discrimination which she alleges may have occurred between June, 1974, and January, 1976. Her motivation appears to be that her gross statistics regarding "grade increases" indicate that women may have been adversely affected by USPS Headquarters promotion practices during this period of time.

23. Her attempt to breathe life into any long-dead claims that arose in this period must fail for several reasons. At the outset, plaintiff has waived her right to represent women denied promotions prior to June 16, 1976. On page 5 of her April 17, 1978 Reply to Defendant's Opposition to Plaintiff's Second Motion to Certify a Class, she stated:

> Federal government employees ... may represent all persons otherwise within a class definition who were affected by an employer's conduct within 30 days of the date the claims of the class representative were "presented to the agency ...."

Plaintiff has chosen a more conservative date, the 15 day period between the receipt of a "final interview" notice from an EEO counselor and the time a written complaint of discrimination is filed with the agency.... Indeed, although plaintiff filed her written complaint on June 29, 1976, and, thus, could represent a class dating from June 14, 1976, she has proposed that the class be cut off at June 16, 1976, the date she actually received her "final interview" notice.

Even if it were possible to do so, it is now too late for plaintiff to extend unilaterally the period for which she is seeking relief.

24. Moreover, as a matter of law, the earlier position set forth in plaintiff's papers is correct. The limitations period in Title VII is to be strictly construed. *International Union of Electrical, Radio & Machine Workers, AFL–CIO, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 240, 97

S.Ct. 441, 449, 50 L.Ed.2d 427 (1976). As stated by the Supreme Court in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977):

> [a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequence.

*Id.* at 558, 97 S.Ct. at 1889. This rule applies in the federal, as well as the private, sector. *Milton v. Brown*, 471 F.Supp. 150, 152–53 (D.D.C.1979); *MacRae v. McCormick*, 458 F.Supp. 970, 974 n.1 (D.D.C.1978). In the federal sector a claim must be presented within 30 days of the date of the discriminatory act complained of. 5 C.F.R. § 713.201 *et seq.; De Medina v. Reinhardt*, 444 F.Supp. 573, 577–78 (D.D.C.1978).

■ 25. It is well established that a class action complaint cannot revive claims which were already time-barred when the original charge was filed. *E. g., Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3rd Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Hence plaintiff was correct when she originally stated that she could not, as a matter of law, represent women denied promotions more than 30 days prior to the time she filed her original complaint.

26. The cases cited by plaintiff do not contravene this well established principle. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975); *Rice v. Gates Rubber Co.*, 521 F.2d 782, 785 (6th Cir. 1975); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 425 (8th Cir. 1970); *McCoy v. Safeway Stores, Inc.*, 5 F.E.P. Cases 628, 630 (D.D.C.1973). The cited cases do not provide authority for the proposition that a federal plaintiff who files an administrative charge in the middle of 1976 may seek to vindicate claims which arose six months, and more, before. Each simply stands for the proposition that the USPS may not defend against a *timely* 1976 claim by showing a lawful employment policy in 1979. The USPS, however, raises no such defense in this case.

27. The only legal basis for holding that a class representative may litigate claims that would normally be timebarred is the "continuing violation" theory. *Davis v. Califano*, 613 F.2d 957, 961 n.30 (D.C.Cir. 1979). That theory is not available to plaintiff in this case for several reasons. First, she waived it when she sought class certification. Defendant was not required to wait until the eve of trial to determine the scope of the class. *See American Pipe Construction Co. v. Utah*, 414 U.S. 538, 545–52, 94 S.Ct. 756, 762–765, 38 L.Ed.2d 713 (1974). It was entitled to rely on the plaintiff's earlier description of the class in preparing for trial. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Second, there is no evidence that plaintiff's claim is anything but an isolated act. The evidence established that in April 1976 Ms. Valentino applied for two promotions and was not recommended for either. This is clearly a discrete act, not a continuing pattern of discrimination against plaintiff.[24] Third, the promotion procedures of 1974 and 1975 were changed on January 28, 1976. At this time the USPS implemented the Essential Vacancy System, with its posting and Review Committee requirements. Thus, any promotion claims which may have arisen in 1974 and 1975 involved practices which ceased on January 28, 1976. Finally, as set forth below there is no evidence of any sex discrimination since January 1976. Thus, there can be no claim that discrimination, if it occurred in 1974 or 1975, has continued

---

24. This action and the Essential Vacancy System procedures, in general, contrast sharply with the promotion practices in *Davis v. Califano, supra*. In *Davis* promotions were not posted and applications were not received from interested candidates who competed with each other for a specific vacancy to be filled. The defendant's procedures in *Davis* allowed individual supervisors to institute promotion actions at any time; thus the failure to be promoted could be justifiably labelled a "continuing violation." *Id.* at 961 n.30.

past January 1976, a time well before the charging period in this case.

28. The Court therefore concludes that the scope of the class is limited to claims of women employed in Headquarters positions in the Washington SMSA at level 17 and above who were denied promotions on or after June 16, 1976.

### C. Non-Statistical Evidence.

29. Plaintiff attempted to prove her allegations of class-wide discrimination through the testimony of several individuals. The Court concludes that she has failed to show that sex discrimination is the "standard operating procedure" of the USPS Headquarters or of the Essential Vacancy System. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).

30. The evidence demonstrates that women are, if possible, selected to sit on Review Committees in the Essential Vacancy System. To prove the "systematic and purposeful" practices necessary to establish class discrimination, plaintiff must show that these women and a large number of other employees have implemented or participated in a systematic, purposeful discriminatory policy. Plaintiff was unable to produce any direct evidence tending to establish such a policy or conspiracy. The absence of such evidence strongly suggests that it does not exist.

31. Plaintiff attempted to meet her burden by presenting testimony of five class members claiming to have been denied promotions because of their sex. But none was able to testify that a *policy* of sex discrimination by officials existed. This evidence differs from that adduced in the *Teamsters* case where witnesses were told that they were being denied positions because of a policy against using non-whites in those positions. *Teamsters, supra*, 431 U.S. at 338, n.19, 97 S.Ct. at 1856, n.19. Each of plaintiff's witnesses testified to having been denied a promotion, and to her own belief that her sex was the operative reason. For plaintiff to prevail, the Court must not only infer from these conclusory allegations that these individual charges of sex discrimination are valid, but also that the acts complained of are part of a systematic USPS Headquarters policy.

32. The Court can draw no such inference. Nothing in the record supports an inference that the class members who testified will eventually prevail on their claims of sex discrimination. As a group these claims are conclusory, and do not demonstrate any class-wide acts or practices. Moreover, even if those claims were valid, there is no reason to believe that they arose out of the systematic policy of which the *Teamsters* case requires proof.

33. Rather than showing class-wide discrimination, the non-statistical evidence indicates that the USPS has not denied class members their Title VII rights. The USPS refused to comply with plaintiff's demand that it structure a major realignment so as to bring it within the reach of the Veterans' Preference Act. It did so, at least in part, to protect its female employees from the adverse impact which Veterans' Preference would have had on their employment status. The USPS has numerous programs designed to increase the representation of women in its higher levels. Four out of five women called on by plaintiff to establish her claim of class discrimination were professionals who had started with the USPS as clericals or blue collar workers. Ms. George, Ms. McCarthy, and Ms. Robinson, all high-level female employees of the USPS testified that they had had valuable experiences in the USPS, had not been the victims of sex discrimination, and had not witnessed sex discrimination in the numerous Essential Vacancy promotions with which they had been involved. The rapid progress of these competent female employees through the USPS strongly corroborates their testimony that plaintiff's class allegations are without merit.

### D. Statistical Evidence.

34. A wide variety of statistical evidence was introduced by the parties and reviewed by the Court in this case. The

most probable, most significant, and most relevant statistics presented to the Court demonstrate that women in the 17 and above levels of the USPS Headquarters, Washington, D.C. SMSA, have not been the victims of sex discrimination with regard to advancement in employment.

### 1. *The Essential Vacancy System.*

35. Plaintiff has structured her case as an attack on the Essential Vacancy System. Not only does plaintiff's individual claim concern her failure to receive two Essential Vacancy promotions, but the claim of every class member whom plaintiff called as a witness in this case arises out of a failure to be promoted under the Essential Vacancy System. Additionally, plaintiff has attacked the subjectivity allowed Review Committees and selecting officials under the Essential Vacancy System, such as, for example, the failure of the System to establish "objective" criteria for each position. Moreover, she has criticized the flexibility of this promotion system, such as, for example, the failure of Essential Vacancy regulations to set forth specifically the number of people to be certified or interviewed by Review Committees. Additionally, she has attacked the USPS' failure to require the retention of the personal working papers of Review Committees and selecting officials who make selections under the Essential Vacancy System.[25]

36. The Court does not find it unreasonable for a federal agency as large, diffuse, and complex as the USPS to have some subjective criteria for the selection of its high-level managers. Indeed, it is virtually impossible to imagine an effective selection process without some subjectivity. *See Rogers v. International Paper Co.,* 510 F.2d 1340, 1345 (8th Cir.), *vacated & remanded on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). In any event, the issue before the Court is not whether the

USPS should have less subjective promotion procedures. The issue is whether the procedures of the Essential Vacancy System discriminate against women, as a class, because of their sex.

37. Plaintiff's attack on the flexibility of the USPS' selection procedure and the failure of the USPS to maintain the records plaintiff deems desirable are equally misplaced. It is not the duty of this Court to require the USPS to maintain an inflexible procedure for the selection of USPS officials, or to add to the volume of paper which is clogging the federal bureaucracy. "The central focus of the inquiry in [this] case ... is ... [whether] the employer is treating some people less favorably than others because of their ... sex ...." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The question of how the USPS should conduct an otherwise non-discriminatory promotion policy is not before the Court. *See* 39 U.S.C. § 1001(b) (providing that officers and employees of the Postal Service shall be appointed "in accordance with the procedures established by the Postal Service").

38. Importantly, the subjectivity, flexibility, and record maintenance procedures of the Essential Vacancy System have not operated to discriminate against women who have applied for promotion under that system. Both the data defendant has extracted from the USPS' Essential Vacancy files and plaintiff's general "grade increase" data for the period beginning in January 1976, show that women, as a class, have not been the victims of sex discrimination since the inception of the Essential Vacancy System.

### a. *The Data.*

39. The most compelling statistical data regarding the Essential Vacancy System are defendant's analysis, by sex, of appli-

---

25. She also attacks the failure of the USPS to validate certain forms that have been used at times in Essential Vacancy promotions. This is, by plaintiff's choice and the Court's June 13, 1978 certification Order and Memorandum Opinion, a *disparate treatment* case. The question of the possible *disparate impact* of unvali-

dated tests is not at issue. Even if it were, however, plaintiff has failed to prove that any USPS act or practice has a disparate impact on women. Therefore, the USPS was under no obligation to validate its procedures. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

cants, those certified and those selected. An examination of these data is the "most direct route" of determining whether women have been discriminated against because of their sex under the Essential Vacancy System. *Hester v. Southern Railway Co.,* 497 F.2d 1374, 1379 (5th Cir. 1974); *see Hazelwood School District v. United States,* 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The results of such an examination are unmistakable: women have not been discriminated against with regard to promotions under the Essential Vacancy System; rather, they have done better than their male counterparts. ·Thus, during the nearly four years that the Essential Vacancy System has been in existence, when both men and women apply for jobs under that system, women represented 26.5% of the applicants, 29.2% of those certified for positions, and 30.7% of those actually promoted into positions. Moreover, this pattern exists for every one of the years that the Essential Vacancy System has been in existence. The Court need look no further than these data to conclude that plaintiff's allegation of sex discrimination against women at USPS Headquarters with regard to advancement at the 17 and above level is without merit.[26]

b. *The Destruction of Records.*

40. Plaintiff contends that the Court ought not consider defendant's statistical evidence from the Essential Vacancy files because, *inter alia*, defendant has destroyed certain promotion files. As noted above, plaintiff's attack on the validity of this data is inadequate. Moreover, plaintiff's allegation of improper record destruction is legally deficient as well.

41. Almost all of the Essential Vacancy files which were destroyed were destroyed pursuant to normal record destruction procedures in 1976, 1977 and early 1978. However, in plaintiff's view, the USPS was obligated to preserve all records potentially rel-

evant to any aspect of her administrative charge. That charge was filed on June 29, 1976.

42. Plaintiff may be correct in contending that a defendant in a class action should not destroy evidence relating to a valid class claim. However, any such rule to that effect would have to be predicated on the assumption that the class action complaint or the class definition will provide the defendant "with the essential information necessary to determine both the subject matter and size of the prospective litigation . . . ." *United Air Lines, Inc. v. McDonald,* 432 U.S. 385, 392–93, 97 S.Ct. 2464, 2469, 53 L.Ed.2d 423 (1977).

43. Plaintiff's administrative complaint in this case was not designed to provide defendant with that essential information. In both her administrative and judicial complaints plaintiff sought to represent a class consisting of all past, present, and future female USPS employees and all past and future female applicants for employment with the USPS. Plaintiff's proposed class did not provide defendant with notice of the "subject matter and size" of this litigation. *United Air Lines, supra,* 432 U.S. at 392–93, 97 S.Ct. at 2469.

44. As a matter of law, this Court cannot hold that anyone who announces an intention to represent a class of all USPS female applicants and employees, for all claims of sex discrimination, thereby imposes an obligation on the USPS to preserve every document which may relate to any applicant for employment or employee in a work force of over 650,000 people.

45. The Court concludes, as a matter of law, that any obligation on defendant to preserve Essential Vacancy files for USPS Headquarters positions at level 17 and above, did not arise until a class was certified by the Court on June 13, 1978. Shortly after the certification order was entered on this date, defendant took steps

**26.** Since January 1976 the only method of advancement for employees at level 17 and above, in USPS Headquarters, Washington, SMSA has been through the Essential Vacancy System, with the exception of a very few promotions above level 30 in the early days of the Essential Vacancy System and a few recent PCES promotions.

to preserve the relevant Essential Vacancy records. Defendant thereby fulfilled its obligation to preserve the relevant records.

## 2. Other Statistics.

46. Numerous other statistics have been presented to the Court. To the extent those statistics have utility in examining the issues of this case, they support defendant's position that, as a class, level 17 and above women at USPS Headquarters have not been and are not being disadvantaged in advancement by virtue of their sex.

### a. Snapshot Statistics.

47. For the entire period for which computer data is available—from June 1974 until October 1979—the representation of women in the 17 and above levels at USPS Headquarters has consistently increased. Significantly, these increases have been made while the total number of employees at USPS Headquarters declined. Thus, while the number of women in the class *increased* by more than 20% during this period, the number of their male counterparts *decreased* by more than 20%. Moreover, when analyzed by levels, the representation of women has increased throughout all levels above level 17 at USPS Headquarters. Such evidence is inconsistent with plaintiff's claim that women are being disadvantaged by virtue of their sex in advancement at level 17 and above in USPS Headquarters.

### b. Cohort Analyses.

48. The Court has also examined defendant's statistical analyses comparing the respective advancement rates of men to women starting at the same time in USPS Headquarters, at the same level, and with the same general length of government service. Although these analyses ignore some important factors, such as qualifications, occupations, and applications, they account for more relevant variables than most of plaintiff's exhibits. These cohort studies indicate that the relative advancement of similarly situated men and women is statistically indistinguishable.

### c. Plaintiff's Non-Regression Statistics.

49. To be probative statistics must reflect qualifications, particularly where, as here, so many different occupations, with so many different qualifications, are at issue. See, *e. g., Hazelwood School District v. United States*, 433 U.S. 299, 306–09, 97 S.Ct. 2736, 2740–2742, 53 L.Ed.2d 768 (1977). Almost all of plaintiff's exhibits, however, fail to take into account qualifications of individuals. Instead, plaintiff's exhibits rely on gross averages simply showing the differences in pay between men and women, or the differences between men and women taking into account only inaccurate educational data. Such information is of little, if any, value in resolving the issues presented in this case.

50. Plaintiff has pointed to *Davis v. Califano*, 613 F.2d 957 (D.C.Cir.1979), as supporting her use of gross, undifferentiated statistics in this case. In so doing she expands the *Davis* decision far beyond its reasonable bounds.

51. Any suggestion that *Davis* has made relevant qualifications unimportant in statistical proof of discrimination is without merit. Indeed, *Davis* specifically holds to the contrary: "The *proper* comparison is between the composition of the *relevant* work force and the qualified population in the *relevant* labor market." *Id.* at 963 (emphasis added). *Davis* holds that the plaintiff's *initial* proof is sufficient to establish a *prima facie* case if it includes "only the *minimum objective qualifications* necessary for one to be eligible for promotion," *id.* at 964 (emphasis in original). After a *prima facie* case is made out, the plaintiff is by no means the prevailing party. The only effect of a *prima facie* case is to shift the burden to the defendant to show that plaintiff's proof is either "inaccurate or insignificant." *Id.* at 962; *see International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867–1868, 52 L.Ed.2d 396 (1977). In this case defendant has done both.

52. The statistics in this case differ from those in *Davis* in several respects. First, *Davis* deals largely with a homogenous pop-

ulation—chemists at the National Heart, Lung and Blood Institute. In *Davis* employees did not apply for promotions but were nominated by supervisors. Therefore, no applicant pools were available for analysis. Dr. Davis established that "there are no minimum necessary objective qualifications" for the positions at issue. *Id.* at 964. In contrast, plaintiff here represents a class consisting of many different occupations with many different and unrelated qualifications: *e. g.*, secretaries, lawyers, engineers, accountants, computer experts, business managers, and personnelists. Plaintiff has not analyzed them. Her statistics are premised on the assumption that the people filling these numerous occupations are fungible, each at least minimally qualified to work in the other's profession. This assumption has no support in the record and is wrong. Thus, even under *Davis* it may be doubted that plaintiff has shouldered the relatively light burden of showing a *prima facie* case. *Davis* requires a plaintiff initially to present statistical data reflecting at least, the "*minimum objective qualifications* necessary for one to be eligible for promotion." *Id.* at 964 (emphasis in original).

53. Second, and in contrast to *Davis*, defendant in this case has counterattacked plaintiff's data. In addition to pointing out the numerous deficiencies in plaintiff's data, the USPS has presented persuasive counter-statistics which account for more relevant qualifications and other factors than plaintiff's statistics. Defendant's Essential Vacancy data are clearly probative. They show that when men and women both apply for positions at level 17 and above in the USPS women are more likely to be selected for promotion than their male counterparts. Defendant's cohort analysis shows that when one considers time and level of entry into the USPS Headquarters work force, as well as length of government service, there is no statistically significant difference in the relative advancement of men and women from January 1974 until October 1979. Finally, defendant's regression analysis shows that when one accounts for the variables of age, length of govern-

ment service, length of government service squared, level, and time in level, there is no statistically significant difference in the salary of men and women.

#### d. *Regression Analyses.*

54. The most sophisticated statistical evidence which plaintiff presented was a series of regression analyses. In these analyses plaintiff sought to account for differences in salary among USPS employees by using certain independent variables. As noted above, the variables plaintiff has used are government service, education, and sex. Accounting solely for these variables, plaintiff's regressions indicate that a statistically significant salary difference exists between male and female employees at level 17 and above, USPS Headquarters.

55. There are serious problems with the regression approach which plaintiff has selected. First, as plaintiff's expert admitted, the regression analysis does nothing to account for relevant time period. Thus, plaintiff's regression has not factored out acts which may have affected salary but which occurred prior to March 24, 1972 (the date when Title VII became applicable to the USPS). As the Supreme Court held in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), a public employer "who from that date forward made all its employment decisions in a wholly non-discriminatory way would not violate Title VII even if it had formerly maintained an all white work force purposefully excluding negroes." *Id.* at 309–10, 97 S.Ct. at 2742–2743 (footnote omitted). Similarly, plaintiff's regressions include acts long since time-barred under Title VII and applicable implementing regulations, as well as under plaintiff's self-imposed time limitations in this case.

56. Apart from the important time element which plaintiff's regressions ignore, there are other serious difficulties with plaintiff's regressions. As the testimony before the Court indicates, the explanatory power of a regression analysis is measured by its R square. The R squares in plaintiff's regression analyses are extremely low.

Indeed, as reflected above, the R squares for plaintiff's most recent set of regressions, the run as of January 1979, was .284. Thus, as plaintiff's expert admitted, 71.6% of an employee's salary could not be explained by the variables considered in plaintiff's regression analysis.

57. Plaintiff's regressions suffered from a low R square because her expert omitted numerous variables which obviously have an impact on salary. Variables such as age, level, and time-in-level are all quantifiable, all logically affect the salaries of USPS employees, and all could have easily been included in plaintiff's regressions. Indeed, defendant's expert prepared a regression analysis which included these variables and which had an R square of .882. The result of defendant's more complete regression analysis—as plaintiff's expert conceded—is that sex is not a statistically significant factor in measuring salaries of USPS Headquarters employees at level 17 and above.

58. The central difference between defendant's regression and plaintiff's is that defendant included level and plaintiff did not. Plaintiff argues that her failure to include level of employees was proper, since, she contends, level is a "tainted" variable. Similarly, plaintiff argues that defendant's inclusion of level is improper. Two cases, *Agarwal v. Arthur G. McKee & Co.*, 19 F.E.P. Cases 503 (N.D.Cal.1977), and *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (E.D.Pa.1977), *aff'd without opinion*, 582 F.2d 1275 (3d Cir. 1978), illustrate that plaintiff's failure to include level is fatal to her analysis.

59. In *Agarwal*, plaintiffs used a regression which included many more variables than plaintiff has used in this case. Plaintiffs there included minority status, total years of education, years since receipt of highest degree, age of employee, age of employee squared, type of professional registration held by the employee, years of prior experience, years of experience with defendant, years of experience with defendant squared, and number of years of any break in service with defendant. *Id.* at 506. Nevertheless, the *Agarwal* court totally discounted this regression because of a "number of defects"—all of which are present in plaintiff's regression in this case. In particular, the *Agarwal* court condemned plaintiff's total exclusion of, *inter alia*, "job level at [defendant]." The *Agarwal* court held:

> [P]laintiff's regression analyses contain a number of defects. *Plaintiff failed to treat salary as a function of job position and salary grade.* Furthermore, plaintiff treated all job positions as fungible, involving equal levels of knowledge, skill, and responsibility. Therefore, plaintiff's statistics do not refute defendant's contention that salary differences between minorities and non-minorities within each job position are not substantial.

*Id.* at 512 (emphasis added). The observations and holdings of the *Agarwal* court are applicable to this case. Plaintiff's regression did not include numerous factors which affect salaries. Most importantly, plaintiff omitted level from her regression analysis.

60. In *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (E.D.Pa.1977), *aff'd*, 582 F.2d 1273 (3rd Cir. 1978), the court rejected plaintiff's contention that level was an improper variable to include in her regression. In *Presseisen* the court examined certain regressions presented by plaintiff in a sex discrimination class action. *Id.* at 614–19. The *Presseisen* court noted:

> [T]he precise issue before the Court is whether [plaintiff's expert] was properly justified in excluding rank in his multiple-regression analysis. The answer is a simple one, and that is that he was not properly justified in excluding rank.

*Id.* at 614. Plaintiff and defendant in this case differ over the precise issue which the *Agarwal* and *Presseisen* courts resolved. Since it is clear that level affects salary, and since it is equally clear that the percentage of men and women vary from level to level, and finally since there is no credible evidence that the USPS has discriminated against women with regard to placement in level during the applicable time period, the Court concludes, as did the *Agarwal* and *Presseisen* courts, that plaintiff's expert erred in failing to include level in his regression analyses.

61. Wholly apart from the issue of whether level should be included in a regression analysis, there are still serious questions as to whether a regression analysis is an appropriate measure of salary differences between sexes in this case. Both plaintiff's and defendant's regression analyses fail to measure many factors affecting salaries such as quality of experience and education, job performance, leadership, skill, and effort. Both the *Agarwal* and *Presseisen* courts held that these flaws undercut the utility of a regression analysis in measuring the salary differences of separate class of employees. Thus, in *Agarwal* the court also condemned plaintiff's failure to measure *quality* of education and experience. *Agarwal, supra,* 19 F.E.P. Cases at 506. Similarly, the *Presseisen* court found that the inability of a regression to measure intangibles which affected salary such as, for example, "scholarship, teaching ability, publications ... quality of degree, career interruptions, career continuity, quality of publications, administrative responsibility, and some measure of committee work" made use of the regression technique inappropriate. *Presseisen, supra,* 442 F.Supp. at 616.

62. Moreover, in *Agarwal* the court identified a fatal flaw that pervades the regressions in this case:

> Finally, the regression analyses contained one deficiency which inhered in the regression technique, not in the quality of plaintiff's data or in the susceptibility of the independent variables to numerical expression. The study focused upon individuals not positions. Plaintiff, therefore, treated all jobs as fungible and as requiring identical prerequisites.

19 F.E.P. Cases at 506. Plaintiff treated the wide variety of positions in USPS Headquarters at level 17 and above as fungible items. For example, her regression compared the position of the Postmaster General to that of his secretary. Common sense dictates that these positions are not comparable, are not fungible, and that any difference in salary cannot be presumed to be the result of sex discrimination by the USPS. Defendant likewise ignored occupa-tional differences; however, because defendant's regression includes level, this deficiency was not as glaring as it is in plaintiff's regressions.

63. The record contains far more useful statistics in this case than either party's regression analyses. To the extent regressions are of assistance, however, it is clear that defendant has accounted for far more relevant variables and has far more logically tried to explain the factors that account for salaries of USPS Headquarters employees than has plaintiff. Using defendant's regression equation, sex is not a statistically significant factor affecting salaries at the level 17 and above, USPS Headquarters. This statistical conclusion fully comparts with the other evidence presented to this Court.

## CONCLUSION

64. Plaintiff has failed to prove either that she has individually been the victim of sex discrimination by the Postal Service or that the class she represents has been so victimized. In the view of the Review Committee, the selecting official, his superior, and the Court, the jobs of Director, OES, and Director, OHR, were filled with the most qualified applicants for those positions. Moreover, it is clear that the USPS has developed numerous programs which have assisted the advancement of women within its upper management ranks and those programs are working to the advantage of women at level 17 and above in USPS Headquarters.

65. The Court enters judgment in favor of defendant and against plaintiff on plaintiff's individual and class claims and dismisses this action with prejudice.